**Frier & Levitt, LLC**
**Attorneys at Law**
*Attorneys for Plaintiff Alliance Cancer Specialists, P.C.*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLIANCE CANCER SPECIALISTS, P.C., <br><br>                      Plaintiff, <br><br>        -against- <br><br> THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC. d/b/a JEFFERSON HEALTH, and JEFFERSON HEALTH-NORTHEAST, <br><br>                Defendants. | **VERIFIED COMPLAINT** <br><br> Civil Action No.: <br><br> Hon. _____ U.S.D.J. <br><br> Hon. _____ U.S.M.J. |

Plaintiff, Alliance Cancer Specialists, P.C. ("Alliance Cancer"), by and through its undersigned counsel, brings this action for damages and injunctive relief under the laws of the United States of America and under Pennsylvania state law against Defendants Thomas Jefferson University Hospitals, Inc. d/b/a Jefferson Health and Jefferson Health-Northeast (collectively "Jefferson"), to remedy a campaign of exclusion, acquisition and intimidation by Defendants that has caused serious harm to health-care competition and consumers, and hereby allege as follows:

## PRELIMINARY STATEMENT

1.      Jefferson is very close to possessing monopoly power in oncology hospital services in Northeast Philadelphia.  Over the past decade or so, Jefferson has taken over multiple competing hospital systems and has purchased private physician practices to solidify its market power in the area. In the same vein, Jefferson attempted to purchase Plaintiff in 2016, but Plaintiff refused and chose to remain an independent competitor to the ever-growing Jefferson system.  Since that time, Jefferson has devised and employed a concerted campaign to eliminate Plaintiff's presence in the oncology marketplace.  The campaign has included the systematic exertion of pressure in Jefferson-employed

physicians to refer patients only to Jefferson-affiliated physicians and facilities, as well as threats and intimidation tactics directed at Plaintiff; and has culminated in its most recent anticompetitive act: arbitrarily terminating the privileges of Plaintiff's oncologists at Jefferson Health-Northeast – thereby effectively eliminating the last remaining competitive constraint on Jefferson's market power, not to mention disrupting the continuity of care for patients who have already chosen to receive cancer treatment from Plaintiff, and virtually eliminating the ability of future patients to receive cancer treatment from Plaintiff.

2.      In Northeast Philadelphia, there are only two oncology practices in the area, Plaintiff and Jefferson.  Access to Defendants' hospital system (*e.g.*, via those admitting privileges which Defendants have now threatened to withdraw from Plaintiff) is an indispensable, essential facility for any meaningful competitive oncology service offering.  By scheming to eliminate Plaintiff, Jefferson strengthens its dominance in the market by, *inter alia*, intimidating Plaintiff's physicians or otherwise obstructing their ability to treat their patients when they are inpatients in the local hospital; not allowing patients to see their treating oncologists, but "steering" or "stealing" them by referring them solely to Jefferson-employed oncologists, regardless of medical necessity or other relevant valid considerations. These referrals are extremely lucrative, as Jefferson can capture reimbursements associated with not only with inpatient hospital services, but also the additional revenues generated from related outpatient services and ancillary care (services that might otherwise be performed at the facilities of an independent physician group – like Plaintiff).  The most efficient way to exercise full control over a doctor's referrals is to "vertically integrate" and employ the doctor directly.

3.      This conduct by Jefferson does not involve competition on the merits to attract patients based on price or quality.  Rather, its actions prevent such competition, by controlling large numbers of physicians and effectively locking up referrals of their patients in-house, leading to the Jefferson system having substantially increased its market share in the Relevant Market.

2

4.     Jefferson attempted to purchase Plaintiff in 2016, seeking to assume its key competitor.  However, because Plaintiff refused to agree to be owned by Jefferson, Jefferson is now attempting to destroy Plaintiff.  Jefferson has done so by admonishing, intimidating, and threatening termination or reduction in compensation to its own employed doctors if they sent oncology patients to Plaintiff.  Effectively, Jefferson tied "incentive" compensation to the well-behaved doctors who refused to refer patients to Plaintiff and instead, retained those patients "in-house" at Jefferson.  The anti-competitive scheme has now culminated in Jefferson's latest threat, whereby it plans to implement a complete refusal to deal with Plaintiff.  Thus, Jefferson's decision to terminate the privileges of Plaintiff's doctors not only harms Plaintiff, but also harms patients and payors (such as insurance carriers and government healthcare programs).

5.     All these actions by Jefferson are intended to eliminate competition among oncologists in Northeast Philadelphia, directly harming the competitive marketplace and vulnerable consumers of oncology services – cancer patients – who have virtually no alternative providers left in the area.  The overarching scheme by Jefferson to achieve these anticompetitive effects has also harmed Plaintiff.

6.     Jefferson has substantially lessened competition in the market for oncology services/cancer care in the Northeast Philadelphia region by placing more physicians under a single roof and by aggressively coercing its employed physicians to refer to other Jefferson physicians whose referrals will generate substantial income for Jefferson vis-à-vis Hospital Outpatient Department ("HOPD") infusion center reimbursements and excess profits from oral oncolytics thanks to Jefferson's access to the 340B Drug Pricing Program (the "340B Program") discounts.

7.     In effect, Jefferson's market power via the referral process ensures that it can continue charging higher prices for cancer care, and in the most unconscionable fashion, Jefferson's conduct interferes with patients' freedom of choice of provider, and increases the financial burden to patients, their employer, and health plans.

3

8.      Jefferson also controls the referrals of cancer patients.  Once a patient is admitted to a Jefferson hospital, Jefferson demands that patients are not "leaked" to its competitors – Plaintiff's oncologists.  When Plaintiff formally articulated its intention to protect itself and its patients from Jefferson's predatory and unethical conduct, Jefferson noticed its anticompetitive intention to terminate the privileges of Plaintiff's oncologists at Jefferson Health-Northeast.  This predicate act will have the devastating practical effect of taking patients away from Plaintiff; preventing Plaintiff from obtaining new patients; increasing patients' costs; diminishing patients' freedom of choice; and destroying Plaintiff's revenue and reputation.  If the termination is successful, it will further restrain competition and effectively grant Jefferson a *de facto* monopoly in the market for oncology care in the affected geographic market.

9.      Jefferson's past and present exclusionary behavior and attempt at monopolization is driven purely by profit motives and the desire to dominate the market, not the best interests of patients.

10.     When patients with cancer are referred by Jefferson-employed physicians to other Jefferson-affiliated physicians and/or facilities, rather than to a private practice like Plaintiff's, Jefferson bills Medicare not only for the facility and professional components of their outpatient treatment, but also for the chemotherapy and other drugs provided, which Jefferson acquires at a staggering discount through the 340B Program.  Jefferson also benefits from the HOPD site-of-service differential, under which a hospital typically receives substantially higher reimbursements for outpatient services than a private clinic or physician's practice receives *for identical services*.

11.     With the benefit of 340B Drug Program discounts and substantially higher HOPD reimbursements (plus the additional benefit of being able to collect facility fees), Jefferson enjoys significantly higher revenues than community oncology practices do *for identical services*, which results in much greater costs to patients and their employers/insurers.  Enriched by this maneuvering,

Jefferson is able to overpay its employed physicians an amount that exceeds the fair market value of their services -- a potentially commercially unreasonable arrangement, tantamount to paying for referrals.  The site-of-service cost differentials in health care are well-documented, and they create an incentive to steer patients away from community oncology practices to the site-of-service where *identical services* result in higher costs to the healthcare system.  Steering patients to Jefferson so that it may financially benefit from 340B Drug Program discounts and HOPD reimbursements prioritizes profits over patient care.

12.     Not only does Jefferson's conduct violate the antitrust laws, but it also violates the Stark Law and the Federal Anti-Kickback Statute.  The compensation of hospital-employed physicians may only be based on professional revenues they generate, not on the volume or value of their referrals.  Similarly, it is a kickback when a medical provider pays money to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs.  Jefferson admonished and intimidated its employed physicians to refrain from referring patients to Plaintiff, and  instead refer all patients with active or suspected cancer to the "in-house" oncologists employed by Jefferson's Sidney Kimmel Cancer Center.

13.     As a result of the anticompetitive scheme described herein, Jefferson has unlawfully abused its market power (or conditions under which there is a dangerous probability that it will obtain monopolistic market power) in the oncology space in the Relevant Market.  Defendants have not engaged in competition on the merits, but rather in a series of acts that individually and collectively harm competition.  Moreover, this conduct has injured Plaintiff while, simultaneously, resulting in higher prices for patients (impeding price) and significantly diminished choice of/access to oncology and hematology care providers (impeding quality competition).

14.     Jefferson's conduct, as set forth herein, also constitutes unfair, deceptive, or unconscionable acts and practices. Along with attempting to destroy Plaintiff's reputation and

business, and the ability to care for its patients, Jefferson's scheme threatens to destroy competition within the oncology care market in the Northeast Philadelphia region; that Jefferson is engaging in this conduct at the expense of patients facing life-threatening disease is patently unconscionable.

15.     Plaintiff filed this case to: (i) reinstate its unrestricted medical staff privileges; (ii) protect and preserve competition for oncology/cancer care in the Northeast Philadelphia area; and (iii) recover damages for injuries sustained by Plaintiff as a result of Jefferson's anticompetitive conduct, its unfair, deceptive, and/or unconscionable practices, and its breach of duties under state common law.

## PARTIES

16.     Plaintiff Alliance Cancer Specialists, P.C. is incorporated in the Commonwealth of Pennsylvania with a principal place of business located at 915 Lawn Avenue, Suite 202, Sellersville, PA 18960.

17.     Plaintiff  is comprised of 36 oncologists at 15 locations throughout the greater Philadelphia area. Plaintiff is a community-based team of cancer experts with an established track record of quality cancer care. Its team of oncology certified nurses, laboratory technologists, and support staff collaborate to provide comprehensive, personalized care and support to its patients.

18.     The Alliance Cancer Specialists at Bensalem division has five physicians and two physician assistants some of whom have been on the staff of the Frankford Health system (later referred to the Aria heath system, and now referred to as Jefferson Health-Northeast) for 34 years. All of the physicians are Philadelphia Magazine Top Doctors and highly respected oncologists throughout the Philadelphia region.  These five oncologists have provided outstanding cancer care to the patients within the Philadelphia region for more than three decades.

19.     Thomas Jefferson University Hospitals Inc. d/b/a Jefferson Health is incorporated in the Commonwealth of Pennsylvania with a principal place of business located at 111 South 11th Street,

Philadelphia, PA 19107.  Jefferson Health is a multi-state non-profit health system with 18 hospitals, including the Sidney Kimmel Cancer Center in Philadelphia County.  As a result of its status as a non-profit hospital system that provides care to indigent patients, Jefferson is eligible to participate in the 340B Program.

20.     Jefferson Health-Northeast is a 3-hospital system in Northeast Philadelphia and Bucks County that is part of Jefferson Health.

## JURISDICTION AND VENUE

21.     This action is brought pursuant to Sections 1 – 4 of the Sherman Act (15 U.S.C. §§ 1 – 4) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).  Plaintiff seeks statutory damages and injunctive relief from ongoing violations of the antitrust laws of the United States.

22.     This Court has subject matter jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. § 1331 and the Clayton Act; and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims stem from the same case or controversy and derive from a common nucleus of operative facts.

23.     This Court has personal jurisdiction over each Defendant, because each Defendant: resides in this District; transacts business in this District; and committed the misconduct and anticompetitive acts alleged herein in this District.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants resided, transacted business, were found, or had agents in this District; most or all of the events giving rise to these claims occurred in this District; and/or a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

## TRADE AND COMMERCE

25.     The activities of Jefferson substantially affect interstate commerce in which Defendants are engaged.  Jefferson treats a substantial number of patients from other states.  Upon

information and belief, it expends millions of dollars on the purchase of supplies in interstate commerce.  Moreover, upon information and belief, millions of dollars of Jefferson's revenues derive from sources located outside of Pennsylvania, including payments from the federal government through such programs as Medicaid and/or Medicare, as well as reimbursements for oncology care products and services by out-of-state commercial payors and health plans.

## STATUTORY BACKGROUND

26.     The Sherman Act outlaws "every contract, combination, or conspiracy in restraint of trade," and any "monopolization, attempted monopolization, or conspiracy or combination to monopolize." 15 U.S.C. §§ 1, 2.  The Clayton Act, 15 U.S.C. §§ 12–27, was enacted to strengthen and clarify the Sherman Act, allowing a private right of action under which successful private plaintiffs may be awarded treble damages and injunctive relief.  *Id.* §§ 15, 26.

27.     Jointly, these statutes prohibit: restraints on trade, 15 U.S.C. §§ 1, 18; monopolization, *id.* §§ 2, 18; and attempted monopolization, *id.*, investing federal courts with jurisdiction to remedy, as well as prevent and restrain violations and attempted violations of the Sherman Act by injunction.  15 U.S.C. § 4.  Section 2 of the Sherman Act, 15 U.S.C. § 2, provides, in pertinent part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony."

28.     The federal antitrust laws are designed to prevent monopolistic conduct in its incipiency and sweep away all appreciable obstructions so that the statutory policy of free trade might be effectively achieved, that is:  The Sherman Act also prohibits attempted monopolization, which can be proven by a showing of predatory or anticompetitive conduct, with a specific intent to monopolize, and a dangerous probability of achieving such monopoly power.  Threatened success of any such attempt may be forestalled by injunctive relief under § 4 of the Sherman Act.

**Federal Health Programs**

29.     The federal government helps provide for two healthcare programs — Medicare and Medicaid.  The programs try to alleviate the burden of healthcare costs, including prescription drugs, for the elderly, indigent, and disabled. 42 U.S.C. §§ 1395 *et seq.*; 42 U.S.C. §§ 1396 *et seq.*

30.     Under the Medicare program, the federal government pays for a physician service at different amounts depending on the place where the beneficiary receives the service. For a service rendered to a patient who is an inpatient of a hospital or an outpatient of a hospital, the "facility rate" is paid.  The facility rate is higher than services that are provided at a physician's practice, referred to as the "nonfacility rate."

31.     The substantially higher hospital outpatient department reimbursements (plus the additional benefit of being able to collect facility fees), allows hospitals to obtain significantly higher revenues than community oncology practices do for identical services.

**The 340B Program**

32.     Congress implemented and designed the federal 340B Program  in 1992 through the Veteran's Health Care Act (P.L. 102-585) to assist certain healthcare providers—referred to as "Covered Entities"— that serve poor, uninsured or otherwise vulnerable populations by permitting them to purchase prescription drugs at lower costs from manufacturers.

33.     Specifically, pursuant to the 340B Program, drug manufacturers are required to charge Covered Entities no more than a significantly discounted "ceiling price" on certain outpatient prescription, in exchange for the manufacturer's drug products being covered by Medicaid and Medicare Part B.  *See* 42 U.S.C. § 256b(a)(1),(4).

34.     Under the 340B Program, Covered Entities can acquire drugs from manufacturers at extreme discounts. In turn, Covered Entities are (in theory) able to "pass on" those savings to their patients through lower costs for medications, or, as contemplated by 340B itself, Covered Entities can

seek reimbursement for 340B drugs in the normal course and use those greater profit margins to subsidize other unfunded areas of their operations. It is fundamental to the 340B Program that Covered Entities are credited for their ability to provide direct clinical care to large numbers of uninsured Americans regardless of the patient's ability to pay. *See* H.R. Rep. No. 102-384, pt. 2, at 12 (Sept. 22, 1992).

35.     As articulated by Congress itself, the 340B Program's purpose is "to enable covered entities to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." *Id.*

36.     Hospitals qualify for the 340B Program (42 U.S.C. § 256b(a)(4)(L)(i) and off-site outpatient facilities not located at the same physical address as the parent hospital covered entity can be listed on the public 340B database, and are able to purchase and use 340B drugs for eligible patients.

37.     Since its implementation in 1992, the 340B Program has grown exponentially. Approximately 14% of all pharmaceutical sales in the United States, or $93.6 billion, are accounted for under 340B.  340B has grown five times faster than the overall drug market, with 340B expenditures quadrupling since 2014.  In terms of magnitude, it is the second largest federal drug program, behind only Medicare Part D.  By 2026, 340B is expected to exceed the size of both Medicaid and Medicare.[1]  Industry experts have opined that "[t]he enormous growth in 340B contract pharmacy arrangements seems to boil down to a *single* factor: *outsized profit margins*."[2]

38.     These profit margins are extremely attractive to hospitals and most hospitals are eager to reap the benefit of the 340B Program for their own financial gain.

---

[1] Berkeley Research Group, LLC, *340B Program at a Glance*, https://media.thinkbrg.com/wpcontent/uploads/2021/12/09062840/340B_Forecast-Report-Infographic_2021.pdf.
[2] Berkeley Research Group, LLC, *For-Profit Pharmacy Participation in the 340B Program*, https://media.thinkbrg.com/wpcontent/uploads/2020/10/06150726/BRG-ForProfitPharmacyParticipation340B_2020.pdf. (emphasis added).

**The Stark Law**

39.     Physicians primarily control patient referrals because they prescribe medical services. Stark law prohibits the buying and selling of patient referrals. Enacted in 1989 to contain healthcare costs and reduce conflicts of interests, the Stark law generally prohibits physicians from referring their Medicare patients to business entities, such as hospitals or laboratories, with which the physicians or their immediate family members have a "financial relationship" unless an exception applies. 42 U.S.C. §1395nn(a)(1); *see* generally 42 C.F.R. §§ 411.350-.389 ("Subpart J---Financial Relationships Between Physicians and Entities Furnishing Designated Services"). Subsequent amendments later extended certain aspects of Stark law to Medicaid patients. *See* 42 U.S.C. §1396b(s).

40.     The statute and regulations further prohibit any entity from submitting a Medicare claim for services rendered pursuant to a prohibited referral, 42 U.S.C. §1395nn(a)(1)(B); 42 C.F.R. §411.353(b), prohibit Medicare from paying any such claims, 42 U.S.C. §1395nn(g)(1); 42 C.F.R. §411.353(c), and require an entity that receives payment for such a claim to return the funds to the United States, 42 C.F.R. §411.353(d).

41.     The Stark Law defines a "financial relationship" to include a "compensation arrangement," 42 U.S.C. §1395nn(a)(2), which means "any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity." *See* 42 U.S.C. §1396nn(H)(1)(A).

42.     In turn, "remuneration" is broadly defined to include "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1395nn(h)(1)(B); *see also* 42 C.F.R. §411.351 ("Remuneration means any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind").

43.     The Stark statute applies to referrals for inpatient and outpatient hospital services and outpatient prescription drugs. *See* 42 U.S.C. § 1395nn(h)(6).

44.     A hospital system employing a physician who refers Medicare or Medicaid patients to that hospital system must satisfy the statutory requirements for "bona fide employment relationships." Under Stark law, a "bona fide employment relationship" must satisfy the following four requirements among others: (1) the "employment is for identifiable services," (2) "the amount of the remuneration under the employment...is consistent with the fair market value of the services" personally provided by the physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn(e)(2).

45.     Any remuneration or benefit given by a hospital system to a physician must be based solely on the physician's personal labor or services personally performed by the physician. 42 U.S.C.S. § 1395nn(e)(2). Stark law prohibits a hospital system from offering or giving remuneration or benefits to referring physicians "in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C.S. §1395nn(e)(2).

**The Anti-Kickback Statute**

46.     In an effort to contain soaring healthcare costs and reduce conflicts of interest, the Anti-Kickback Statute ("AKS") redresses the corruption of offering or paying inducements to influence referrals of patients. The AKS applies to all providers and covers referrals of all services to patients insured by federal healthcare programs.

47.     The AKS prohibits "knowingly and willfully" offering or paying "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b). The AKS specifies that "remuneration" includes "any kickback,

bribe or rebate" and broadly applies to benefits provided "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1320a-7b(b)(1) & (2). "Remuneration" is defined elsewhere to include "transfers of items or services for free or for other than fair market value." 42 U.S.C. §1320a-7a(i)(6).

48.     The AKS arose out of Congressional concern that financial inducements to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, too costly, of poor quality or potentially harmful to a vulnerable patient population. The AKS was enacted in part based in part on studies demonstrating that physicians, even those intending to act in good faith, were likely to refer significantly more patients when there was a financial incentive to generate business. To protect the integrity of federal healthcare programs, Congress enacted a per se prohibition against financial inducements in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.

49.     First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that financial inducements masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

50.     The AKS is violated if a hospital system or other provider knowingly and willfully offers remuneration to induce referrals even if the doctors are not actually induced. *See* 42 U.S.C. §1320a-7b(b)(2)(A) (prohibiting the offer or payment of remuneration for the purpose of inducing referrals). Under the AKS, any amount of inducement is illegal.

## FACTUAL ALLEGATIONS

51.     Over 25 years ago, Alliance Cancer Specialists brought radiation therapy to the hospital (now Jefferson Health-Northeast) and built a highly respected cancer program through its relationship with the University of Pennsylvania.

52.     In July 2016, Aria Health system was purchased by Jefferson.  At that time, Allen Terzian, M.D. (an oncologist and the current President of Alliance Cancer Specialists) was the Chief of Oncology, the Director of the cancer center, and served on the Board of Directors.  He was previously the president of the medical staff and was on the physician advisory board regarding the sale of the hospital to Jefferson.  At the time of the purchase, Plaintiff was informed that it was the largest referring practice in any specialty to Jefferson.

53.     Based on the large number of referrals to the hospital, Jefferson was eager to employ Plaintiff and its physicians.

54.     Qualifying hospitals, such as Jefferson, benefit from a collaboration with a physician practice group because services furnished under the umbrella of the Jefferson hospital system enjoy significant advantages, namely: the opportunity to obtain chemotherapy drugs, at the deeply discounted 340B Program rate.  In addition, Jefferson would be reimbursed for those outpatient services at the substantially higher HOPD rates.

55.     Indeed, the site-of-service cost differentials in health care are well-documented, and they create an incentive to steer patients away from community oncology practices to the site-of-service where *identical services* result in higher costs to the healthcare system.

56.     Steering patients to Jefferson – in some instances, in spite of the patient's explicit request to be treated by Plaintiff -- so that Jefferson may financially benefit from 340B drug discounts and HOPD reimbursements prioritizes profits over patient care.

57.     Plaintiff did not want to be employed by the hospital and, at that time in 2016, was told by a representative of Jefferson that Plaintiff's independent practice would be respected. However, after the sale from Aria to Jefferson was completed and during continued negotiations to remain independent, Plaintiff was informed that cancer services would only be allowed through "Jefferson employment as 340B pricing on drugs was too lucrative for a hospital to pass up."

14

58.     For approximately 30 years, Plaintiff had rented space from the hospital and maintained an infusion center to deliver chemotherapy to its patients. When Jefferson became 340B-eligible, it proceeded to build an infusion center within a few hundred feet of Plaintiff's office.  When the new infusion center was completed, Jefferson cancelled Plaintiff's lease with little notice and evicted Plaintiff.

59.     The eviction occurred in early 2020 during the onslaught of the COVID-19 epidemic. Plaintiff was fortunate to find office space nearby so that there was no interruption of care for its patients with cancer.

60.     Shortly thereafter, Dr. Terzian was asked to resign from the Jefferson Board because of an unspecified "conflict of interest."  When Dr. Terzian requested details about the alleged conflict, Jefferson refused to provide any explanation whatsoever.

61.     Dr. Terzian did not resign.  In response, Jefferson refused to send him the zoom links to the Board meetings (which were all virtual at the time).

62.     Ultimately, Dr. Terzian was fired as Chief of Oncology without any reason or justification and his practice was no longer invited to the Cancer Care Committee.

63.     Although Jefferson would not explicitly say so, Dr. Terzian was terminated as Chief of Oncology (1) in retaliation for the Plaintiff's refusal to be employed by Jefferson and (2) to ensure that Dr. Terzian would not be privy to Jefferson's anti-competitive scheme.

64.     After terminating Dr. Terzian, Jefferson removed the names of all Plaintiff's physicians from the hospital website.  When Dr. Terzian requested from the president of the hospital and acting president of the medical staff to place them back on the website, he was told:  "there's nothing we can do about it."

65.     Subsequently, Jefferson listed the Plaintiff's physicians as internists on the hospital website.  This was yet another step to impede the Plaintiff's doctors from competing in the oncology market in Northeast Philadelphia.

66.     Jefferson also refused to electronically link Plaintiff's doctors to its electronic interface so that they could not receive radiology reports on their patients.  In response, Plaintiff initiated a meeting with Jefferson to reinstitute the electronic interface, and after months of scheduled meetings, Jefferson decided "not to prioritize [the interface project] at this time." Hospital interfaces are standard practice and timely access to radiology results for patients with cancer is essential to quality care. Jefferson's lack of commitment to resolving the concern is an anticompetitive and obstructionist maneuver aimed at undermining Plaintiff's physicians.

67.     Over the next year or so, Plaintiff continued to receive the vast majority of all inpatient oncology consults from the Jefferson-employed hospitalists  The hospitalists indicated that they preferred to consult Plaintiff's doctors  because of the greater attentiveness and care for their patients as compared to the Jefferson-employed oncologists.

68.     As Jefferson saw it, Plaintiff continued to be an impediment to Jefferson's scheme to dominate the market for oncology care in the Northeast Philadelphia region.

**Jefferson's Demand to Limit Patient Leakage and Refer Patients to Itself.**

69.     In April 2021, Amanda Caldwell, Associate Administrator, Department of Emergency Medicine, Department of Hospital Medicine, Jefferson Health-Northeast emailed Hospitalists stating:

> "If you are receiving this email, it is noted that you consulted the incorrect Oncology group for one or more of your patients. Please note that **all new Oncology consults must go to SKCC (Sidney Kimmel Cancer Center) at all campuses**. Established patients who are already being treated by another group may continue to go to them; however, we need to do our best to send all **new** consults to SKCC. If you would like specific examples, please let me know and I will send. Thank you for your attention to this!" (emphasis in original).

16

70.    The physicians who received this message reasonably understood it to mean that under all circumstances, only referrals to hospital-employed physicians are acceptable. Specifically, all new oncology consults must be referred to the Jefferson-owned Sidny Kimmel Cancer Center.

71.    The email is an example of inappropriate pressure and intimidation by Jefferson to limit patient "leakage" and refer patients to itself.

72.    On September 17, 2021, Dr. Terzian received a menacing text from an unknown source stating, among other things, "If I hear about you or your reps visiting anymore [sic] Jefferson practices, there will be hell to pay."

73.    The reference to Jefferson practices suggests that someone employed by, or otherwise affiliated with, Jefferson sought to intimidate Plaintiff and threaten their existence in the Philadelphia-area oncology marketplace.

74.    In February 2022, approximately 18 months ago, Jefferson's Chief Medical Officer Gary Welch, M.D. (the "CMO") called a meeting of the hospitalists and forbid them from using Plaintiff's group for oncology care.

75.    Specifically, the CMO told the Hospitalists at the meeting that there was too much patient leakage and admonished the Hospitalists by reiterating that they are expected to refer patients only to the Sidney Kimmel Cancer Center so that Jefferson could pay the Hospitalists' salaries, and further, inferred that their continued employment was conditioned upon their referrals.

76.    The CMO directed that, moving forward, any Hospitalists that refers a patient to a hematologist or oncologist not employed by Jefferson must justify the referral by documenting the reason in the patient's chart.

77.    He cited the reason as, "we need the income from the cancer program to help pay your salaries."

78.     The Hospitalists interpreted this instruction as requiring the diversion of cancer patients exclusively to Jefferson-employed hematologists and oncologists at the Sidney Kimmel Cancer Center.  The Hospitalists further interpreted the demand that patient leakage be documented in the chart as a way for Jefferson to identify which staff member is/was responsible for any lost patient referral.

79.     Following this meeting, Plaintiff's inpatient work markedly decreased.

**Jefferson Created a Document in an Effort to Limit Patient Leakage and Keep Referrals Within Jefferson.**

80.     This, however, was still not enough.

81.     Jefferson had a subsequent meeting informing the Hospitalists that they would have to fill out a two-page form (an "Oncology Services Assessment Form" hereinafter referred to as the "Form") requiring an explanation any time a Hospitalist or Jefferson staff member used or consulted a physician or group outside of the Jefferson system (which includes, and primarily refers to, Plaintiff's independent group of physicians). Jefferson claimed that it  implemented the use of this form for "quality improvement."

82.     Upon information and belief, Jefferson introduced this official policy requiring physicians to: (i) complete the Form whenever the physician determines that a consult outside of Jefferson is appropriate; and (ii) supply a narrative explanation detailing the reasoning for the physician's decision to make the outside referral.

83.     The Form is proof that a decision to consult an oncologist not employed by Jefferson is, by definition, an "alternative" decision, *i.e.*, that the default, proper decision is to direct all referrals to Jefferson.

84.     The policy, presented in writing to Members of the Hospital Medicine Department, notes that timely completion of the Form will be evaluated to determine each physician's eligibility for certain types of incentive compensation.

85.     Jefferson conditioned "incentive compensation" on employed physicians' compliance with the policy, which is clearly designed to increase referrals to Jefferson so that it can profit from 340B drug discounts and HOPD-reimbursements.

86.     Later, the Hospitalists were told that their bonus at the end of the year would be tied to the use of the Form.

87.     The Hospitalists understood this as intimidation and feared they would be fired if they referred patients to Plaintiff.

88.     The Form plainly requires physicians to *justify* their referral decisions, and notably, it explicitly includes a reminder that their compliance impacts the physicians' incentive compensation.

89.     Many of the Jefferson Hospitalists have apologized to Plaintiff's doctors, indicating that they will be fired if they refer patients to Plaintiff.

90.     By way of example, Plaintiff received a consult request to see a patient with severe anemia. After seeing the patient and communicating with the Jefferson-employed hospitalist who had requested the consult, the hospitalist shared that she had been personally called by a Jefferson-employed oncologist (the "Jefferson Oncologist"), who informed the hospitalist that she had mistakenly requested the consult from ACS. When the hospitalist replied that the decision to request the consult from Plaintiff was deliberate, the Jefferson Oncologist advised that he was directed by his Chief Physician to call the hospitalist to inform her that she had, in fact, consulted the wrong group.

91.     It is unclear how the Chief Physician became aware of the consult, but it is apparent that Jefferson is (1) monitoring requests for oncology consults initiated by its hospitalists, (2) taking steps to admonish employees who permit "leakage," and (3) disrupting and redirecting the patient's plan of care for its own pecuniary gain.

92.     One Jefferson-employed surgeon reported that Jefferson tracks every cancer patient and reviews her charts demanding an explanation for every patient sent to Plaintiff's group.

93.     Jefferson's actions are not only legally and morally wrong, but they affect patient care in the most critical of areas, cancer care.

94.     By way of another example of patient steering and limiting patient leakage, Plaintiff was consulted on a case involving a 48-year-old man with acute leukemia.  The patient specifically requested the consult with Plaintiff, as documented in the patient's chart, but the consult was inexplicably cancelled by a Jefferson employee.

95.     On at least one occasion known to Plaintiff, a Jefferson physician shared fabricated information with a patient with the express purpose of influencing the decision-making of a frightened oncology patient so that the patient would choose Jefferson doctors for treatment.

96.     Patient steering and patient stealing of this kind is particularly abhorrent in the context of cancer care, where patients are susceptible to the (misleading) suggestion that their choice of provider and/or site-of-care may enhance their prospects of survival.

97.     There is no other reason for Jefferson's anticompetitive behavior (preventing leakage, self-referrals, intimidation, stealing patients, and tying compensation to referrals) except to attempt to monopolize the oncology market in the Philadelphia region.  Such a monopoly would allow for more 340B profits and lucrative HOPD reimbursements generated from outpatient services.

98.     Compensation of hospital-employed physicians may only be based on professional revenues they generate; basing their compensation on the volume or value of their referrals is a violation of Stark and the Anti-Kickback Statute. *See* Stark 2021 Final Rule ("neither the existence of the compensation arrangement nor the amount of the compensation [can be] contingent on the number or value of the physician's referrals to the particular provider, practitioner, or supplier.").

99.     Jefferson's compensation arrangement with the hospitalists potentially violates both the fair market value requirement and the requirement that the remuneration not take into account the volume or value of referrals.  By the CMO's own admission, the compensation paid to the

20

hospitalists is based, in part, on their referrals to Jefferson and implies that Jefferson cannot "afford" to pay the hospitalists unless they refer all patients within the JNE system. This strongly suggests that Jefferson is paying compensation in excess of fair market value of the hospitalists' services.[3]

**Jefferson takes a big step toward attempting monopoly power by noticing the termination Plaintiff's hospital privileges.**

100.     By letter dated July 31, 2023 Jefferson stated that it is terminating the medical staff privileges of Plaintiff's oncologists, effective September 16, 2023.

101.     Jefferson is terminating the hospital privileges of Plaintiff's oncologists because it is exclusively contracting with its own employed oncologists at the Sidney Kimmel Cancer Center.  In other words, Jefferson is keeping all oncology care to itself.

102.     When Jefferson took over the hospital (now Jefferson Health-Northeast), it had an obligation to the great people of Northeast Philadelphia who have been served by Plaintiff for 35 years. Jefferson has fallen short of its obligation to care for the community, and is instead focused on constraining Plaintiff's ability to deliver cancer care and pushing Plaintiff out of the market.

103.     The 340B Program discounts provide Jefferson with an astronomical profit margin from chemotherapy drugs. 340B Program discounts were intended to allow Covered Entities to furnish services to indigent patients. Notably, Jefferson recently closed all surgical services at the southern division, which is in the poorest area in Philadelphia.  In addition to 340B Program discounts, Jefferson is also enriched by its provision of outpatient chemotherapy because as previously noted, chemotherapy administered in an HOPD is dramatically more expensive than *the same chemotherapy* administered in a private oncologist's office.

---

[3] This behavior is not new.  Right before the merger with Jefferson, Arial Health Systems settled two False Claims Act matters, which, notably, included a $2.5 Million payment to resolve alleged violations regarding excessive compensation to physicians. In light of that settlement, it would be surprising to observe anything less than vigilant regulatory compliance by Jefferson, but the actions of Jefferson and the comments reportedly made by the CMO suggest otherwise.

104.    Should Plaintiff's physicians lose their admitting privileges, it will be a serious disruption to the continuity of patient care.  It is vital to hospitalized patients with cancer to continue to receive care from someone who knows the patient's background and treatment history.  At any given time, Plaintiff has between 10 to 15 patients in the hospital.  It will be devastating to patient care for the treating oncologists to not be allowed to treat their patients at the hospital, *i.e.* for patient choice to decrease.

105.    In addition, Plaintiff's oncologists will have very limited ability to provide outpatient transfusions and will be forced to send their patients to the Emergency room for a routine outpatient procedure.

106.    Unfortunately, this story is not unique, as it is happening to many private oncology practices throughout the country.  Hospitals profit and patients with cancer suffer.  Jefferson, like other hospitals, is bleeding out the independent practice (Plaintiff) to build a monopoly.

107.    In connection with the notice of termination of Plaintiff's medical staff privileges, one Jefferson-employed surgeon recently remarked, "what a stupid vindictive move by Jefferson. They don't care about patients."

108.    The termination also violates Pennsylvania law and, in particular, the requirement that bylaws contain fair hearing and appellate review mechanisms for a practitioner subject to revocation of privileges.  *See* 28 Pa. Code § 107.12 ("bylaws shall provide for the establishment of fair hearing and appellate review mechanisms, which will be available if requested by the practitioner in connection with medical staff recommendations for denial of staff appointments, as well as the denial of reappointments, or the curtailment, suspension or revocation of privileges.").

109.    Jefferson failed to afford Plaintiff a fair hearing or any due process.  The notice only permits Plaintiff to request an informal meeting with "the Board or a committee designated by the

Board to discuss the matter" and notes that the affected member "will not be entitled to any other procedural rights."

110.    On August 24, 2023, Plaintiff asked Jefferson if its counsel could attend the meeting. The next day, Jefferson responded that counsel may not attend the meeting.

111.    On August 24, 2023, Plaintiff also requested a fair hearing with Jefferson, as opposed to an informal meeting.  Jefferson responded that Plaintiff is not entitled to request a hearing, let alone a fair one.  Jefferson's bylaws only permit a "meeting" and prohibit "any other procedural rights with respect to the decision or the effect of the contract on his/her clinical privileges."  This provision and the denial of a fair hearing violates Pennsylvania law.

112.    On August 31, 2023, some of Plaintiff's physicians met with a proxy for the board and the committee would not provide Plaintiff with any information.  Specifically, they would not discuss why the board terminated the privileges of Plaintiff's oncologists.  However, the committee conceded that the termination of privileges was not based on any shortcomings of Plaintiff's practice or the treatment of its patients – which reinforces that the decision is driven by profit motives and the desire to dominate the market, not the best interests of patients.

**Jefferson's actions impede patient choice and remove competition from the market.**

113.    Patient choice in healthcare is the legal right of a patient to choose where and from whom he or she receives treatment.

114.    Plaintiff's physicians are highly qualified and respected oncologists and hematologists who are long-time members of the Jefferson staff, and who would routinely refer patients to Jefferson for inpatient and outpatient services. Plaintiff historically received regular consult requests from Jefferson until February 2022, when institutional pressure and policy required Jefferson employees to keep referrals within the Jefferson system.

115.    Jefferson Health-Northeast Hospitalists strongly disagree with Jefferson's decision to terminate privileges.  The Hospitalists agree that Plaintiff's physicians provide excellent quality of patient care and have contributed immensely to the hospital for decades.

116.    Jefferson's actions are clearly not in furtherance of quality care, but rather intimidation and exclusion such that all oncology patient referrals remain "in-house" – under the guise of care enhancement.

117.    Hospitalists are regularly intimidated by texts, calls, and meetings to reiterate that they are not allowed to refer to Plaintiff, regardless of their professional judgement about what is best for the patient.  Despite these demands, some Hospitalists have tried to occasionally refer patients to Plaintiff for peace of mind that a specific patient will receive the very best care, only to risk admonishment and retaliation from Jefferson.

118.    As previously mentioned, the 48-year old man with acute leukemia expressly requested a consult with Plaintiff and the consult was cancelled by a Jefferson employee.  Upon information and belief, the patient – who would have been timely seen and attended to by Plaintiff's doctors – was never seen by the Sidney Kimmel Cancer Center group; rather, the oncologist just remotely entered a note in the patient's chart. Chemotherapy was not promptly initiated in accordance with the standard of care, and tragically, the patient died within a few days. Though it cannot be stated with certainty that the patient would have survived if he had seen his provider of choice, it is inexcusable that the patient's express request was denied.

119.    Jefferson's actions are not motivated by optimal patient care; it is apparent that Jefferson cares only to dominate the market and financially enrich itself.

120.    In connection with the notice of termination of Plaintiff's medical staff privileges, a physician in the Interventional Radiology department at Jefferson Health-Northeast remarked: "What on earth are they thinking of? How does this help anyone?"

121.   In fact, Jefferson purchased Abington Hospital and has treated the Abington independent oncologists in a similar manner.

122.   Jefferson has attempted to monopolize the oncology market in the Northeast Philadelphia region.   First, by mandating no patient leakage, threatening Plaintiff, then tying compensation to referrals, and ultimately terminating Plaintiff's privileges and attempting to push Plaintiff out of the market completely.   This scheme and its effects must be considered as a whole, and not simply its component parts, each of which Plaintiff alleges is anticompetitive, as the Jefferson's scheme has enabled it to enhance its market power in the relevant market, leading to competitive harm to consumers, *inter alia* by reducing patient choice and disallowing continued care by existing oncologists, as well as harm to both overall competition, *inter alia* by eliminating the final competitive restraint on Jefferson's monopoly, as well as harm directly to Plaintiff, *inter alia* by interfering with its existing physician-patient relationships, causing financial damages, and injuring the business model and reputation of Plaintiff.   In addition, Jefferson's actions violate federal law (Stark and the AKS) and similarly violate the Pennsylvania Unfair Trade Practices and Consumer Protection Law and common law.

## RELEVANT MARKET

123.   The relevant geographic market for purposes of Jefferson's conduct, as described herein, is the Northeast Philadelphia region, specifically consisting of Bucks and Philadelphia counties.[4]   ("Relevant Geographic Market").

124.   With respect to oncology care in the Relevant Geographic Market, the only competitive options are Jefferson and Plaintiff.   At any given time, Plaintiff has between 10-15 of their own patients as inpatients of the hospital, while Jefferson retains the remainder of cancer patients and

---

[4] The pertinent zip codes comprising the Relevant Geographic Market are:  19007, 19020, 19030, 19047, 19053, 19054, 19055, 19056, 19057, 19111, 19114, 19116, 19124, 19135, 19136, 19149, and 19152.

works toward eventually treating the entire cancer patient population in the Relevant Geographic Market if the privileges of Plaintiff's physicians are terminated.

125.     Patients in the relevant geographic market do not have other options for cancer care, such as University of Pennsylvania and Fox Chase.  Patients in Northeast Philadelphia do not travel to receive care in New Jersey and many patients do not want to travel west of Route 1.  Nazareth Hospital has only an extremely small proportion of cancer care from the area and has a generally poor reputation for cancer care. Oncologists located outside the Relevant Geographic Market are not reasonable substitutes, as they are too distant from local patients.  As described in more detail above, oncologists outside this Market area do not actively compete for patients in the Relevant Geographic Market, and *vice versa*, in-Market patients largely do not seek to travel to more distant locations to receive oncology care.

126.     Jefferson's conduct, as described herein, substantially affects interstate commerce. The patients seeking cancer care are comprised of individuals residing in and travelling from Pennsylvania, as well as other states, including New Jersey, which abuts Philadelphia and is partially included in the relevant geographic market of the Northeast Philadelphia region.

127.     A large percentage of Jefferson's revenues comes from sources located outside of Pennsylvania, including both private payors and the federal government (through its Medicare and Medicaid programs).  Jefferson also purchases a substantial portion of their medicine and supplies from sellers located outside of Pennsylvania. Last, many employers and insurers outside of Pennsylvania have made payments to Jefferson.

128.     The "Relevant Product Market" applicable to these claims is the market for oncology (or cancer care) for commercially or governmentally insured patients.  There is no substitute for oncology care services as described herein.  The market includes non-surgical management and treatment of cancer by physicians in an inpatient and outpatient setting, including chemotherapy,

hormone therapy, immunotherapy, and other targeted therapy for the treatment of cancer. Doctors providing these services are hematologists/oncologists, who are specialized physicians who receive an extended education that includes medical school, a three-year residency in general internal medicine and an additional two-year fellowship in medical oncology. For these reasons, other physicians are not substitutes for medical oncologists for cancer patients. For all cancer patients, by whom the services of an oncologist are required, there are no acceptable alternatives to those provided by Plaintiff and Defendants.

129.    Both Jefferson and Plaintiff provide the same products or services, which are rendered within the above-described relevant product market in which they both compete.

130.    Within the market, Plaintiff's specialist oncologists have no alternatives in terms of admitting cancer patients to the hospital, and the only option for their patients is to go to Jefferson Health-Northeast hospital. Indeed, a patient who seeks emergency care and calls 911 will result in the patient taken to Jefferson Health-Northeast.

131.    Providers offering services within the relevant product market do not have the ability to determine the fees paid under the Medicare or Medicaid governmental insurance programs, whereas providers do have the ability (which may depend in part on their market power) to negotiate rates that private payors, such as insurance companies, pay. These privately-paid rates, are ordinarily substantially higher than those paid by either Medicare or Medicaid.

<u>**ANTICOMPETITIVE EFFECTS AND IMPACT**</u>

132.    Jefferson acted with the purpose and effect of unreasonably restraining and injuring competition in the relevant product and geographic markets (jointly, "Relevant Market").

133.    But for the conduct described herein: (1) Jefferson's market power in the Relevant Market would be reduced; (2) there would be increased competition and patients would have the freedom to exercise their right to choose a provider; (3) Jefferson would be unable to demand that

Hospitalists exclusively refer patients to Jefferson's oncology group; (4) Plaintiff's reputation would not be harmed and Plaintiff would not be subject to the intimidation and retaliation tactics currently imposed upon them by Jefferson; and (5) the aggregate cost of cancer care in the Relevant Market would be lower, and the quality of care would be higher in the relevant market.

134. Prices are higher when the hospital controls all outpatient oncology care due to HOPD site-of service-rates and the quality of patient care (*i.e.*, quality of services) in the Philadelphia area will suffer when there is only one provider (Jefferson) in the relevant market.

135. In addition, the anticompetitive behavior has caused and will continue to cause irreparable harm to Plaintiff in the following ways:

a. Jefferson has hurt Plaintiff's reputation by intimidating doctors not to refer to them. A change in hospital privileges will appear to referring doctors as a decrease in the ability to provide coordinated care. When the community finds out that Plaintiff's physicians do not have full privileges at the hospital, it will make them a less desirable destination for cancer care.

b. It will make it very difficult to recruit new doctors.

c. Jefferson has significantly decreased new patient volume forcing hospitalists to refer to the group employed by Jefferson.

d. It incentivizes Jefferson to continue patient stealing and steering.

e. It hurts financially and interferes with Plaintiff's ability to pay for supportive services for our patients.

f. It violates patient choice and competition when Jefferson ignores requests to use Plaintiff's group.

g. Even outpatient physicians (i.e. physicians not employed by Jefferson) are intimidated to send patients to Plaintiff for fear of retaliation.

h. It harms Plaintiff's existing value-based care contract with Tandigm and will harm its value-based program with Independence Blue Cross ("IBC") where IBC will reimburse Plaintiff based on performance. The latter program is scheduled to begin in September. The program rewards providers for providing high-quality, cost-effective care and includes metrics such as emergency room visits, hospitalization and readmission for patients on chemotherapy, patient experience and patient's satisfaction, number of days on hospice and advance care planning. The lack of hospital privileges will impact performance on several of these measures, especially when the emergency room is not calling to inform them that its patients are in the hospital.

136. Jefferson is requiring Plaintiff to be observers of their own patients in the hospital even

though Plaintiff's doctors are in the best position to care for the inpatients.[5]

137.    Jefferson's conduct, as described herein, also harms patients because:

i.    Treating oncologists, who know the patient's history and course of care, will not know when patients are admitted to the hospital.  Many patients do not recall their history or their present treatment, and management of these patients without a proper history is dangerous.

j.    Treating oncologists routinely administer very toxic treatments and side effects of these drugs are a not well known to hospitalists. Jefferson Northeast has one employed oncology attending, who is not board certified or eligible in oncology. The head of the Jefferson Oncology group who rounds is a thyroid cancer expert and has little experience in general oncology care.

k.    There is a lack of continuity of care if you cut out the treating oncologist.  The employed Hospitalists do not return phone calls in a timely manner and may have a different attending round every day. They sometimes do consults over the phone without seeing the patient and have a nurse practitioner see the patients in follow-up without proper oversight.

l.    Many patients have recent outpatient radiology studies at non-Jefferson facilities which are not available to the hospital doctors. New radiology studies performed after admission are routinely compared to a remote study and are misread as cancer progression when the cancer is actually improving or vice versa. Misinformation given to patients can be very upsetting to them.

m.    Between 5 and 10 patients per week depend on outpatient transfusions which have to be received in a hospital setting. If Plaintiff's physicians are not allowed to place orders for transfusion, they will be forced to send some of the patients to the ER where they will wait for hours and may stay overnight for an outpatient procedure.

n.    If a patient of Plaintiff is admitted and the treating doctors are not involved in the care, there will be a potential disconnect in patient care which could lead to harm. For example, a patient may get mistreated thinking they are on chemotherapy when indeed they are on immunotherapy. When mismanaged like this, it could be fatal.

o.    Patients depend on the treating physician being present for admission and trust their care.  Many times, difficult decisions regarding goals of care and hospice occur in the hospital setting. The exclusion of Plaintiff's physicians from these conversations with patients that have been under Plaintiff's care for years is very problematic.

138.    As a direct result of the anticompetitive course of conduct described herein, competition in the relevant market has been unreasonably restrained and Plaintiff has been and will be substantially limited in its ability to effectively compete in the market for oncology care.

---

[5] As a consolation to terminating Plaintiff's privileges, Jefferson extended a sham offer for adjunct "privileges." All a doctor with adjunct privileges can do is visit patients and review the patients' hospital medical records.  A visiting family member could do those things.  Critically, an adjunct is not permitted to, among other things, admit patients, attend patients, exercise clinical privileges, write orders or notes or make any notation in the medical record, participate in care to the patient at the hospital.

139.    In furtherance of the scheme described herein, Jefferson instructed its physicians and employees not to refer patients to Plaintiff, admonished and threatened physicians and employees who have referred patients to Plaintiff or permitted patient leakage, have tracked referrals to itself, tied compensation to referrals to itself, stole patients, and harmed Plaintiff's reputation to the point where it is no longer receiving referrals or communications when its patients are brought to the hospital.

140.    These actions were particularly harmful to Plaintiff as the overwhelming majority of patients in the Northeast Philadelphia area are treated by either Plaintiff or Jefferson.  There is no other reasonable alternative hospital for the Plaintiff to practice oncology and all of its patients that seek inpatient care go to Jefferson Northeast.

141.    Moreover, as part of this scheme, Jefferson actively lured patients away from Plaintiff and prevented Plaintiff from achieving the level of growth it would have achieved absent Jefferson's anticompetitive conduct.

142.    Additionally, the scheme described herein culminated in Plaintiff's physicians unjustifiably losing their medical staff privileges at Jefferson.  Given the high barriers to entry that prevent the timely and effective opening of any hospital that would provide an alternative outlet for Plaintiff's specialists to practice oncology services, effective competition on the merits is directly harmed by the preclusion of Plaintiff to provide the services it has offered in the past, until the culmination of Jefferson's scheme resulted in the unilateral and economically unsound termination of admission privileges, as described herein.

143.    Plaintiff has experienced loss of income due to the foreclosure of competition in the relevant market and suffered harm to its business and property.

144.    These injuries were a direct and foreseeable result of Jefferson's anticompetitive course of conduct, as described herein.  Further, these actions have deprived Plaintiff of the benefits of open

competition, and represent precisely the type of conduct the antitrust laws were designed to protect against.

**FIRST CAUSE OF ACTION (All Defendants)**
**(Section 2 Sherman Act, Attempted Monopolization)**

145.    Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

146.    Establishing attempted monopolization requires proof (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.  It is not necessary to show that success rewarded the attempt to monopolize; rather, when that intent and the consequent dangerous probability exist, the Sherman Act, like many others and like the common law in some cases, directs itself against the dangerous probability as well as against the completed result.

147.    Specific intent to monopolize does not mean an intent to compete vigorously; rather, it entails a specific intent to destroy competition or build or maintain monopoly power.  Objective intent manifested by the use of prohibited means is sufficient to satisfy the intent component of attempt to monopolize.

148.    The dangerous probability inquiry requires consideration of the relevant market and the defendant's ability to lessen or destroy competition in that market.

149.    As set forth herein, Jefferson has engaged in a purposive overall scheme that includes various forms of exclusionary, predatory, and anticompetitive conduct that, when added together, creates a dangerous probability that it will achieve its goals and obtain monopoly power in the relevant markets in which it did not already possess such power.

150.    As set forth herein, Jefferson has acted with the specific intent to destroy its only competition, Plaintiff, and once destroyed, it will have a monopoly of oncology services in the geographic market.  As set forth herein, Jefferson intents to destroy a competitive marketplace and

attempt to monopolize the relevant market by prohibited means, including: instructing its physicians and employees not to refer patients to Plaintiff, admonishing and threatening physicians and employees who have referred patients to Plaintiff, have tracked referrals to itself, tied compensation to referrals to itself and the lack of patient leakage (in violation of Stark and the Anti-Kickback statute), stole patients, and harmed Plaintiff's reputation to the point where it is no longer receiving referrals or communications when its patients are brought to the hospital.

151.    Jefferson's concerted efforts to destroy its only competition in the Relevant Market, Plaintiff, shows both an intent to and dangerous probability of achieving monopoly power.

152.    Plaintiff has experienced loss of income and harm to its reputation due to the foreclosure of competition in the relevant market and suffered harm to its business and property. These injuries were a direct and foreseeable result of Jefferson's anticompetitive course of conduct, as described herein. Further, these actions have deprived Plaintiff of the benefits of open competition and represent precisely the type of conduct the antitrust laws were designed to protect against.

## SECOND CAUSE OF ACTION (All Defendants)
### (Section 1 Sherman Act, Unreasonable Restraint of Trade)

153.    Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

154.    In addition to its monopolization efforts described above, Jefferson has also unreasonably restrained trade in the Relevant Market, in violation of Section 1 of the Sherman Act, as part of its overall anti-competitive scheme.

155.    Jefferson's termination of the privileges of its competitor in the Relevant Market, together with internal exclusive agreements by Jefferson with its physicians and medical staff to refer oncology cases predominantly if not solely to Jefferson-owned physicians or facilities is an unreasonable restraint of trade under Section 1 of the Sherman Act.

156.    As a direct result of Jefferson's antitrust violations, Plaintiff has suffered injury and

damages to its business and property, which Jefferson intended to cause. Further injury is threatened if Defendants' ongoing conduct in furtherance of this anti-competitive scheme is not enjoined, threatening to further harm competition in the Relevant Market.

## THIRD CAUSE OF ACTION (All Defendants)
### (Clayton Act)

157.     Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

158.     Section 4 of the Clayton Act seeks to deter antitrust violations and compensate their victims, stating: "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

159.     As described herein, Jefferson's attempted monopoly and scheme to destroy its only competition violates the antitrust laws.

160.     As a direct result of Jefferson's conduct as described herein, Plaintiff has experienced loss of income and harm to its reputation due to the foreclosure of competition in the relevant market and suffered harm to its business and property, among others, as cognizable injuries which the antitrust laws were intended to prevent. These injuries were a direct and foreseeable result of Jefferson's anticompetitive course of conduct, as described herein.

161.     Further, these actions have deprived Plaintiff of the benefits of open competition and represent precisely the type of conduct the antitrust laws were designed to protect against. As such, Plaintiff is entitled to recover threefold the damages sustained, and the cost of suit, including reasonable attorneys' fees.

162.    In addition, Jefferson's actions described above have had the effect of lessening competition substantially in interstate trade and commerce in the Relevant Market, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

163.    As a direct and proximate result of Jefferson's violations of Section 7 of the Clayton Act, Plaintiff has suffered irreparable harm and damages to its business and property. These violations, and the anticompetitive effects and the irreparable harm caused thereby, will continue unless enjoined.

**FOURTH CAUSE OF ACTION (All Defendants)**
**(Breach of Contract, under PA law)**

164.    Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

165.    Pennsylvania law requires that hospital bylaws contain fair hearing and appellate review mechanisms for a practitioner subject to revocation of privileges.  *See* 28 Pa. Code § 107.12 ("bylaws shall provide for the establishment of fair hearing and appellate review mechanisms, which will be available if requested by the practitioner in connection with medical staff recommendations for denial of staff appointments, as well as the denial of reappointments, or the curtailment, suspension or revocation of privileges.").

166.    Under Pennsylvania law, a hospital's medical staff by-laws constitute an enforceable contract between a hospital and members of its medical staff.

167.    Jefferson failed to afford Plaintiff a fair hearing or any due process whatsoever.  The notice only permits Plaintiff to request an informal meeting with "the Board or a committee designated by the Board to discuss the matter" and the affected member "will not be entitled to any other procedural rights."

168.    Jefferson did not permit counsel to attend the informal meeting and explicitly denied Plaintiff's request for a <u>fair</u> hearing with Jefferson by stating that Plaintiff is not entitled to a hearing, let alone a fair one.

34

169.     At the meeting, individuals present on behalf of the board would not provide Plaintiff with any information.  Specifically, they would not discuss why the board terminated the privileges of Plaintiff's oncologists.  However, the committee conceded that the termination of privileges was not based on any shortcomings of Plaintiff's practice or the treatment of its patients – which reinforces that the decision is driven by profit motives and the desire to dominate the market, not the best interests of patients.

170.     Jefferson's denial of a fair hearing violates Pennsylvania law.

171.     Jefferson breached its duty to provide due process.

172.     As a result of Jefferson's actions, Plaintiff has been directly damaged in the form of loss of income and harm to its reputation and suffered harm to its business and property.

**FIFTH CAUSE OF ACTION (All Defendants)**
**(Breach of Contract via Implied Covenant of Good Faith and Fair Dealing, under PA law)**

173.     Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

174.     Pennsylvania law requires that hospital bylaws contain fair hearing and appellate review mechanisms for a practitioner subject to revocation of privileges.

175.     Under Pennsylvania law, a hospital's medical staff by-laws constitute an enforceable contract between a hospital and members of its medical staff.

176.     Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement.

177.     To the extent that Jefferson's bylaws do not contain the right to a fair hearing and appellate review mechanisms, Jefferson is violating Pennsylvania law.

178.      A good faith term can be an explicit or implicit term of the contract.  The implicit term is one required by law in hospital bylaws, *i.e.* "the establishment of fair hearing and appellate review mechanisms."

179.    Jefferson failed to afford Plaintiff a fair hearing or any due process whatsoever.  The notice only permits Plaintiff to request an informal meeting with "the Board or a committee designated by the Board to discuss the matter" and the affected member "will not be entitled to any other procedural rights."

180.    Jefferson did not permit counsel to attend the informal meeting and explicitly denied Plaintiff's request for a <u>fair</u> hearing with Jefferson by stating that Plaintiff is not entitled to a hearing, let alone a fair one.

181.    At the meeting, individuals present on behalf of the board would not provide Plaintiff with any information.  Specifically, they would not discuss why the board terminated the privileges of Plaintiff's oncologists.  However, the committee conceded that the termination of privileges was not based on any shortcomings of Plaintiff's practice or the treatment of its patients – which reinforces that the decision is driven by profit motives and the desire to dominate the market, not the best interests of patients.

182.    Jefferson's denial of a fair hearing violates Pennsylvania law.

183.    Jefferson breached its duty to perform and carry out the contract in good faith and fairly in accordance with law.

184.    As a result of Jefferson's actions, Plaintiff has been directly damaged in the form of loss of income and harm to its reputation and suffered harm to its business and property.

## SIXTH CAUSE OF ACTION (All Defendants)
### (Unfair Trade Practices and Consumer Protection Law, under PA law)

185.    Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

186.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") seeks to prevent "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce … ." 73 P.S. § 201-3.  Courts liberally construe the UTPCPL in

order to effect the legislative goal of consumer protection.

187.    The UTPCPL provides a private right of action for anyone who "suffers any ascertainable loss of money or property" because of an unlawful method, act or practice. *See* 73 P.S. § 201-9.2(a). Upon a finding of liability, the court has the discretion to award "up to three times the actual damages sustained" and provide any additional relief the court deems proper.

188.    As set forth herein, Jefferson has acted unfairly and deceptively to destroy competition by prohibited means, including:  instructing its physicians and employees not to refer patients to Plaintiff, admonished and threatened physicians and employees who have referred patients to Plaintiff, have tracked referrals to itself, tied compensation to referrals to itself and the lack of patient leakage (in violation of Stark and the Anti-Kickback statute), stole patients, and harmed Plaintiff's reputation to the point where it is no longer receiving referrals or communications when its patients are brought to the hospital.

189.    As a result of Jefferson's actions, Plaintiff has been directly damaged in the form of loss of income and harm to its reputation and suffered harm to its business and property.  As such, Plaintiff is entitled to recover threefold the damages sustained, and the cost of suit, including reasonable attorneys' fees.

### SEVENTH CAUSE OF ACTION (All Defendants)
**(Tortious Interference with Business Relations, under PA law)**

190.    Plaintiff restates and incorporates each and every allegation above as if the same were fully set forth herein.

191.    Under Pennsylvania law, a hospital's medical staff by-laws constitute an enforceable contract between a hospital and members of its medical staff.  Jefferson acted purposefully to destroy the existing relation with Plaintiff and terminating its physicians' privileges without any legitimate or legal justification.

192.    Specifically, Jefferson interfered with Plaintiff's business relations by:  instructing its

physicians and employees not to refer patients to Plaintiff, admonished and threatened physicians and employees who have referred patients to Plaintiff, preventing patient leakage, stealing patients, making threats, disrupting patient care, limiting patient choice, and harming Plaintiff's reputation to the point where it is no longer receiving referrals or communications when its patients are brought to the hospital.

193.    These affirmative acts were undertaken for the specific purpose of interfering with Plaintiff's business relationships with its patients. These actions were also unjustified as they were undertaken to injure Plaintiffs and further an unlawful, anticompetitive scheme as opposed to the legitimate acquisition of business.

194.    Jefferson has also interfered with Plaintiff's business relationships with Tandigm and IBC and their value-based contract.   IBC will reimburse Plaintiff based on performance and the lack of hospital privileges negatively impacts Plaintiff's performance on several key measures.

195.    As a result of the interferences described herein, Plaintiff was damaged in the form of lost income and the diminished value of its business and reputation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment against the Defendants as follows:

- That Defendants have unlawfully attempted to monopolize the market for oncology in Northeast Philadelphia;

- That Plaintiffs have been injured in its business by reason of Defendants' unlawful and anticompetitive behavior;

- That Defendants have breached its contract with Plaintiff;

- That Defendants have violated the Pennsylvania UTPCPL;

- That Defendants have tortiously interfered with Plaintiff's business relationships;

- That Defendants are enjoined from terminating the privileges of Plaintiff's physicians;

- That Plaintiff is awarded threefold damages as a result of Defendants' conduct, as required by federal and state statutes;

- That Plaintiff is awarded its reasonable attorneys' fees and costs incurred in pursuing this action in accordance with the federal antitrust laws; and

- That the Court award such other relief as it deems just, necessary and proper.

## JURY DEMAND

Plaintiff requests a trial by jury of all issues so triable.

Respectfully submitted,

/s/
Jonathan E. Levitt, Esq.  (Bar. # 323942)
Daniel B. Frier, Esq. (Bar # 308540)
Matthew J. Modafferi, Esq. (Pro Hac Vice Forthcoming)
Jason N. Silberberg, Esq. (Pro Hac Vice Forthcoming)
FRIER & LEVITT, LLC
84 Bloomfield Avenue
Pine Brook, New Jersey 07058
jlevitt@frierlevitt.com
mmodafferi@frierlevitt.com
jsilberberg@frierlevitt.com
Telephone: (973) 618-1660
Facsimile: (973) 618-0650

101 Greenwich Street, Suite 8B
New York, New York 10006

*Attorneys for Plaintiff*

DATED: September 5, 2023

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United

States of America that the foregoing Verified Complaint is true and correct to the best of my present

knowledge and belief.

Dated:  September 5, 2023

Allen Terzian, M.D.
President, Alliance Cancer Specialists, P.C.
On behalf of Alliance Cancer Specialists, P.C.