**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALLIANCE CANCER SPECIALISTS, P.C.,**<br>**ALLEN TERZIAN M.D.,**<br>**ANJANA RANGANATHAN M.D.,**<br>**MOSHE CHASKY M.D.,**<br>**SRAMILA AITHAL M.D., and**<br>**FREDERICK DOLD M.D.,**<br><br>                              **Plaintiffs,**<br><br>    **v.**<br><br>**THOMAS JEFFERSON UNIVERSITY**<br>**HOSPITALS INC., d/b/a JEFFERSON HEALTH,**<br>**JEFFERSON HEALTH-NORTHEAST, and**<br>**JEFFERSON MEDICAL GROUP,**<br><br>                              **Defendants.** | **CIVIL ACTION**<br>**NO. 23-3449** |

**Scott, J.**                                                                 **September 18, 2023**

<u>**MEMORANDUM OPINION**</u>

This Motion for a Temporary Restraining Order and Preliminary Injunction (Motion for

TRO) seeks to enjoin a hospital from effectively closing its oncology and hematology staff by

terminating the oncology and hematology medical privileges of five oncologists employed by an

independent practice that works very closely in outpatient and inpatient settings with patients in

the surrounding community. Most of the plaintiffs' patients are poor and cannot easily travel to

other hospitals, and allegedly, in an emergency, about 95% of these patients would be

transported from their homes to the Torresdale campus of Jefferson Health-Northeast (JNE).

While the court understands the plaintiffs' concerns and desires to maintain the continuity of care

for their own patients, the court denies the Motion for TRO because it is not persuaded that either

of the two threshold elements for a temporary restraining order or preliminary injunction are met:

First, the court is not persuaded that the patients antitrust claims brought under Sections 1 and 2

of the Sherman Act, 15 U.S.C.A. §§ 1-2, have more than a negligible chance of success. Second, the court is not yet persuaded that the plaintiffs will suffer immediate, irreparable harm; at this point, the harms identified appear to be either speculative or possible to remedy through financial compensation if the plaintiffs ultimately prevail in this litigation. However, the court denies the motion without prejudice – if the plaintiffs are able to cure the large gaps in their antitrust claims *and* if some of the currently speculative concerns about the oncologists' pending request for internal medicine privileges at JNE become realities, then this court would entertain another motion.

## I.      BACKGROUND

### A.      Parties Involved and Corporate Structure

Considering almost all[1] of the filings in this matter and representations made at oral argument, the relevant parties are as follows:

Plaintiffs (collectively, "the ACS plaintiffs"): Alliance Cancer Specialists, P.C (ACS), is a community-based team of five oncologists and two physician's assistants "who practice exclusively at the Bensalem location and treat patients in Northeast Philadelphia." *See* Am. Compl. ¶¶ 17-23.[2] The five doctors who work at ACS were joined as plaintiffs in the Amended

---

[1]      The Amended Complaint is considered on a very limited basis in the court's disposition of this motion. The court considers information that it expected to see in an amended complaint (such as the renaming of the parties).

The Amended Complaint does not comply with Part III.E.5 of the court's Policies and Procedures, which provides that "[a]mended pleadings must clearly indicate the additions or corrections made through comments, tracked changes, or both (the party may file both a clean copy and a copy with tracked changes)." Moreover, the Amended Complaint was filed after the court's clear deadline for supplemental information for the instant motion, which was the end of day on September 14, 2023. *See* Tr. 194-95. The Amended Complaint will be considered in any future motions.

[2]      The initial complaint alleged that ACS was comprised of 36 oncologists at 15 locations throughout the greater Philadelphia area, and that ACS had a principal place of business at 915 Lawn Avenue, Suite 202, Sellersville, PA 18960. Compl, ¶¶ 16-17. It referred to the five oncologists as working at the "Alliance Cancer Specialists at Bensalem division". *Id.* at ¶ 18.  The amended complaint still

Complaint: Allen Terzian, M.D., Anjana Ranganathan, M.D., Moseh Chasky, M.D., Sramila Aithal, M.D., and Frederick G. Dold, M.D. Am. Compl. They are referred to collectively herein as "the ACS oncologists."[3] Dr. Terzian is the President of ACS. *Id.* at ¶ 19.

Defendants (collectively, "the Jefferson defendants"): Jefferson Health-Northeast (JNE) has three hospital campuses: Jefferson Torresdale and Jefferson Frankford, which are in Northeast Philadelphia, and Jefferson Bucks in Bucks County. Defs.' Opp'n, Ex. B, ¶ 3(Aff. of Edward Turzanski). Jefferson Medical Group (JMG), a party added in the amended complaint, is alleged by the plaintiffs to be a nonprofit medical practice "that is not owned by Jefferson, but consists of individual doctors employed by Jefferson." Am. Compl. ¶ 26.

"Thomas Jefferson University Hospitals, Inc., d/b/a Jefferson Health" appears to be incorrectly named in both the complaint and the amended complaint.  The defendants state that *Thomas Jefferson University* d/b/a Jefferson Health (Jefferson Health) is the "corporate parent" of JNE and Thomas Jefferson University Hospitals, Inc. (TJUH), the two defendants named in the initial complaint. Defs.' Opp'n to Mot. for TRO 1 n.1 (Defs.' Opp'n). According to the defendants, TJUH, has no control or authority over JNE or Jefferson Health or the other parties named in this action. *Id.* ACS apparently intends for Jefferson Health to refer to a "multi-state non-profit health system with 18 hospitals." Compl. ¶ 19; Am. Compl. ¶ 24. The court preliminarily finds that Jefferson Health refers to the parent sitting at the very top of the hospitals

---

maintains that the principal place of business for ACS is at the Sellersville address. *See* Am. Compl. ¶ 16. But now ACS is just the Bensalem location. *Id.* at ¶ 17. Dr. Terzian provided an affidavit that states that ACS has 15 locations in Pennsylvania, and "There is no cross coverage in Alliance Cancer locations. Our five oncologists practice exclusively at the Bensalem location and do not go to the other 14 locations. The Bensalem division is financially distinct from the other locations." Aff. of Allen Terzian, M.D., ¶ 2, ECF No. 17.

[3]     All five doctors are board-certified oncologists; Dr. Ranganathan is also a board-certified hematologist. *See* Am. Compl. ¶¶ 19-23.

or entities involved. The court's references to Jefferson Health herein do not refer to TJUH.

    <u>Defendants' Structure</u>: According to an affidavit provided by the defendants, Jefferson Health is ultimately the parent entity of three other entities mentioned in this lawsuit: JNE, JMG, and Sidney Kimmel Cancer Center (SKCC). The defendants describe JMG as a group "of physician providers, some of whom provide hematology and oncology services to and for the SKCC." Defs.' Opp'n, Ex. B, Aff. Of Edward Turzanski ¶ 5.[4]

## B.    Events Leading Up to the Revocation of the ACS Oncologists' Medical Staff Privileges at JNE

    The parties have very different positions about which events are relevant to the instant motion: ACS focuses on the past seven years and the Jefferson defendants focus on the immediate past and present. As explained further at Part III.A.1.a, *infra*, the broader context is relevant to the plaintiffs' legal claims. However, the sole issue that is relevant to the "immediate harm" analysis of any TRO or injunction is the impending loss of the ACS oncologists' hospital privileges.

    ACS alleges that it essentially built the cancer program at the Aria Health hospital system (Aria) over 25 years ago. Compl. ¶ 51. When Jefferson Health bought Aria in July 2016, Dr. Terzian was Aria's Chief of Oncology, the Director of Aria's cancer center, and served on Aria's board of directors. *Id.* at ¶ 52. Allegedly, at the time of the purchase, ACS was informed that it

---

[4]    According to the Exclusive Services Agreement discussed *infra*, JMG is a non-profit corporation that has "controlled affiliates whose physicians deliver professional oncology and hematology care as part of [SKCC]." *See* Defs.' Opp'n, Ex. B-1, 1. The court is unaware of JMG's and SKCC's relationships within Jefferson Health's corporate structure or the extent to which SKCC physicians and JMG physicians overlap, but the court noted that a letter attached to the defendants' supplemental briefing refers to SKCC physicians having the exclusive right to perform oncology and hematology services. *See* Defs.' Letter Br., Ex C-1 (letter regarding ACS oncologists' pending applications for internal medicine privileges), ECF No. 20. However, the precise relationship of SKCC and JMG is not relevant to the court's reasoning for denying the instant motion.

was the largest referring practice to Jefferson[5] and that Jefferson would respect ACS's

independent practice. *Id.* at ¶¶ 52, 56.

For about 30 years, ACS rented space from Aria and then the Jefferson defendants.[6] ACS

utilized this space to maintain an infusion center to deliver its patients' chemotherapy. *Id.* at ¶ 58.

In early 2020, during the COVID-19 epidemic, Jefferson built an infusion center a few hundred

feet away from ACS's space, and when the new infusion center opened, Jefferson allegedly

promptly evicted ACS from ACS's rental space. *Id.* at ¶¶ 58-59. ACS found other office space

nearby without interrupting care for its cancer patients. *Id.* at ¶ 59. Allegedly, these actions were

timed after the Jefferson defendants became eligible for a particular drug pricing program that

would allow access to deeply discounted chemotherapy drugs. *See id.* at ¶¶ 6, 10-11, 58.

Soon after that, Dr. Terzian was asked to resign from JNE's board, and when he refused

to resign, he stopped receiving links to the board's virtual meetings. *Id.* at ¶¶ 60-61. Dr. Terzian

was fired as Chief of Oncology, and ACS was no longer invited to the Cancer Care Committee.

*Id.* at ¶ 62. Allegedly, no reasons were provided for these decisions, but the ACS plaintiffs

believe that the Jefferson defendants' motives were to (1) retaliate against ACS for its refusal to

be employed by Jefferson Health and (2) prevent Dr. Terzian from learning of the Jefferson

defendants' "anti-competitive scheme." *Id.* at ¶ 63. Additionally, the ACS oncologists were

removed from JNE's website and then relisted as "internists." *Id.* at ¶¶ 65-65. Moreover, the

Jefferson defendants refused to allow the ACS oncologists to electronically link to its electronic

interface, which allegedly prevented or disrupted the ACS oncologists from receiving radiology

---

[5]    Any reference to "Jefferson" is an indication that it is unclear to the court whether Jefferson Health, JNE, or some other entity in the Jefferson Health system was the specific actor.

[6]    It's unclear from the complaint whether the space was rented from Jefferson Health or JNE.

reports on their patients. *Id.* at ¶ 66.[7]

However, from 2020 until as late as April 2021, ACS allegedly "continued to receive the vast majority of all inpatient oncology consults from the Jefferson-employed hospitalists."[8] It is unclear to the court from any filing when Jefferson Health began working with or acquired Sidney Kimmel Cancer Center (SKCC), but the complaint refers to an April 2021 email in which a JNE administrator directed hospitalists to refer all new oncology consults to SKCC, which was allegedly part of the Jefferson Hospital system at that point.[9] *See id.* at ¶¶ 69-70. ACS alleges that this was an "example of inappropriate pressure and intimidation by Jefferson to limit patient 'leakage' and refer patients to itself." *Id.* at ¶ 71. The complaint then alleges many other instances of the Jefferson defendants' efforts to prevent "leakage" or to ensure that hospital staff would refer new oncology cases only to oncologists employed by the Jefferson Hospital system; the complaint characterizes many of these facts as examples of patient steerage and patient stealing. *See id.* at ¶¶ 69-97. These facts are largely not relevant to the pending motion, but present a history of ACS's issues with JNE and ACS's shrinking inpatient work over the past three or so years.

### C.    The Impending Revocation of the ACS Oncologists' Medical Staff Privileges at JNE

Finally, on July 31, 2023, the ACS plaintiffs received a letter from the Jefferson defendants. *See id.* at ¶ 100. The Jefferson defendants provide an affidavit from Dr. Angela

---

[7]    It is unclear whether the ACS oncologists had access to the electronic interface, and that access was revoked, or whether the Jefferson defendants considered allowing enabling such access, and then decided to "deprioritize" that project. *See* Compl. ¶ 66.

[8]    It is not clear if the plaintiffs mean to distinguish "the Hospitalists" from "hospitalists" in their filings, but the term appears to generally refer to a physician who specializes in treating hospitalized patients.

[9]    It's not clear from any filing when exactly SKCC became part of Jefferson Health.

Nicholas, JNE's Chief Medical Officer, which encloses a copy of the letter dated July 31, 2023. *See* Defs.' Opp'n, Ex. A (Aff. of Dr. Nicholas) & Ex. A-1 (Notice of Intent). That letter informs any recipient that JNE intended to enter a one-year Exclusive Services Agreement with SKCC (the Agreement). *See id.* at 1; *see also* Defs.' Opp'n, Ex. B ¶¶ 13-14 (Aff. of Edward Turzanski) & Ex. B-1 (execution version of the Agreement). Effective September 16, 2023, the recipients of the letter would no longer be able to exercise their "current medical staff privileges." However, they would be able to continue to care for any current patients admitted to JNE before September 16, 2023, until the date of that patient's discharge from JNE. *See id.* The letter also informs recipients that they may apply for Adjunct Staff status at the hospital. *See id.*[10] Finally, the letter notes that any recipient could request a meeting with a committee of JNE's board "to discuss the matter prior to the contract in question being signed by [JNE]." *See id.*[11]

At the hearing, Dr. Terzian testified that after learning of the imminent termination of their oncology privileges, the ACS oncologists requested privileges as internal medicine physicians at JNE. *See* Tr. 130, ECF No. 27. At the time of the hearing, these requests for internal medicine privileges were still pending, and Dr. Terzian did not believe that the privileges

---

[10]   According to the letter, Adjunct Staff may visit their hospitalized patients, review their JNE medical records, attend JNE's educational activities, and use JNE's diagnostic facilities; Adjunct Staff may not admit patients, attend patients, exercise clinical privileges, make notes on patients' JNE medical records, "[a]ctively participate in the provision or management of care to patients at the hospital," or hold any office or committee position at JNE. *See id.* at 2.

[11]   According to JNE's bylaws, because the recipient's privileges would be terminated due to JNE's entry of an exclusive contract, the ACS oncologists were entitled to a more limited review process than they would have been if they had been terminated for disciplinary reasons. *See* Defs.' Opp'n, Ex. A-1 (portions of bylaws). The Notice Letter refers to Part II, Article 4.E(3) of JNE's bylaws, which governs a termination of privileges due to JNE's entry into an exclusive agreement with another party for the provision of clinical services. *See* Defs.' Opp'n, Ex A-2, 2. In that event, the affected physician is entitled to request a meeting with JNE's board or a committee designated by the board "to discuss the matter prior to the contract in question being signed by [JNE]. At the meeting, the affected member will be entitled to present any information relevant to the decision to enter into the exclusive contract. That individual will not be entitled to any other procedural rights with respect to the decision." *See id.*

ultimately would be granted. *See id.* at 135-37. The defendants' supplemental briefing attached

an affidavit noting that the five ACS oncologists submitted completed credentials packets for

"Core Internal Medicine privileges" on September 12, 2023, and that the JNE Medical Staff

Credentials Committee reviewed and voted in favor of granting these privileges requests on

September 18, 2023. *See* Defs.' Supp. Br., Ex. C (Second Aff. of Dr. Angela Nicholas), ¶¶ 2, 6.

However, the ACS oncologists initiated their applications sometime before that, according to a

letter sent from Brian Sweeney, President of JNE, to the ACS oncologists dated August 21,

2023. *See* Defs.' Supp. Br., Ex. C-1 (President Sweeney's letter). President Sweeney's letter

states in part that:

> I recognize that each of you is board-certified in Hematology, Medical Oncology,
> and Internal Medicine, and that you each therefore may seek privileges in Internal
> Medicine. However, I write to avoid any potential misunderstanding about the
> scope of privileges that you may exercise at the Hospital while the Agreement is in
> effect. The Hospital's exclusive arrangement, once signed and effective, will be
> with respect to the performance of oncology and hematology services, without
> regard to whether the physician performing such services is doing so through the
> Division of Hematology and Oncology or has "changed their hat" to the Division
> of Internal Medicine.
>
> Of course, if you seek privileges in Internal Medicine in order to perform other
> services, unrelated to oncology and hematology, you may proceed in accordance
> with the process established by the Bylaws. . . .
>
> However, if the purpose of your seeking privileges in Internal Medicine is to
> continue to perform oncology and hematology services (e.g., to admit patients for
> cancer-related care; to attend patients with respect to their cancer-related treatment;
> to write orders or progress notes, or make notations in the medical record with
> respect to patients' cancer-related care; or otherwise to participate actively in the
> provision or management of cancer-related care to patients), then, pursuant to the
> Bylaws and as a result of the Agreement and following its signature and
> effectiveness, you will be unable to do so, without regard to whether you would
> seek to do so through the Division of Hematology and Oncology or the Division of
> Internal Medicine.

*See id.* The parties heavily contest what exactly JNE would allow the ACS oncologists to do as

internal medicine specialists, based on the content of this letter. The ACS oncologists' request

for internal medicine privileges is still pending, but Dr. Nicholas avers that JNE's Medical

Executive Committee is scheduled to review the Credentials Committee's recommendations on

September 18, 2023, and JNE's board is scheduled to review the Medical Executive

Committee's recommendations on September 20, 2023, and in her experience, these bodies

usually agree with the Credentials Committee. *See* Defs.' Supp. Br., Ex. C ¶¶ 7-9.

### D.   Procedural History

This is a rapidly developing matter. The plaintiffs filed their original complaint on

September 5, 2023. *See* Compl., ECF No. 1. On September 6, 2023, at about 4:00 p.m., the

plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction. *See* ECF

No. 6. After reviewing the filings and realizing that plaintiffs challenged an action by Jefferson

that would go into effect Saturday, September 16, 2023, the court set a hearing for September 13,

2023. *See* Not. of Hr'g, ECF No. 6. On September 12, 2023, the court received Defendants'

Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction.

*See* ECF No. 13. The court heard oral argument and testimony from three of the five ACS

oncologists on September 13, 2023. *See* ECF No. 19; Tr., ECF No. 27.

## II.   LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council,*

*Inc.*, 555 U.S. 7, 22 (2008). A party seeking a TRO or preliminary injunction must show

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will
> be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court
> . . . should take into account, when they are relevant, (3) the possibility of harm to
> other interested persons from the grant or denial of the injunction, and (4) the public
> interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. V.*

*Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974) (alterations in *Reilly*).

The Third Circuit clarified and reiterated in *Reilly* that the

> movant for preliminary equitable relief must meet the threshold for the first two 'most' critical' factors: it must demonstrate that it can win on the merits . . . and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.

*Id.* at 179.

## III.   DISCUSSION

The ACS plaintiffs have failed to persuade the court that there is a reasonable probability of eventual success in this federal lawsuit *and* that the plaintiffs would suffer some irreparable harm if a TRO or preliminary injunction is not issued. Thus, the motion fails to meet both threshold prongs required for the court to issue a TRO or preliminary injunction. While it is not necessary for the court to reach the other two prongs of the TRO analysis, the court briefly addresses them for completeness.

### A.   The ACS Plaintiffs Have Failed to Show a Reasonable Probability of Eventual Success in the Litigation.

A movant can show a reasonable likelihood of success on the merits by showing a prima facie case rather than a certainty that the litigant will win at trial. *See Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017). A reasonable probability of eventual success in the litigation "'requires a showing significantly better than negligible but not necessarily more likely than not.'" *Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018) (quoting *Reilly*, 858 F.3d at 179)).

This standard is not met for either of the two federal claims that the plaintiffs presented

for this motion[12]— an attempted monopolization claim under Section 1 of the Sherman Act and
an unreasonable restraint on trade claim under Section 2 of the Sherman Act. At oral argument,
the court requested that the parties provide supplemental briefing on whether the court could
issue a TRO or preliminary injunction if the court is not persuaded that the federal claims have a
reasonable likelihood of eventual success, but the court finds that one of the state claims has a
reasonable likelihood of eventual success. After reviewing the parties' supplemental briefings, it
seems that the district court has discretion to enter a TRO or preliminary injunction on the
strength of state claims, but it is not clear when the district court should exercise that discretion.[13]
In this particular case, the court declines to reach the state law claims due to the short timing of
the court's consideration of this motion and the court's conviction that *both* threshold prongs are
not met. However, the court would consider the state claims if the ACS plaintiffs filed a
subsequent motion for TRO or preliminary injunction and the court found that the irreparable
harm prong is met.

### 1.    Attempted Monopolization, Sherman Act § 2

Section 2 of the Sherman Act prohibits the attempted monopolization of trade or
commerce. 15 U.S.C.A. § 2. To prove an attempted monopolization claim, a plaintiff must show:
"(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific
intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Phila. Taxi
Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir. 2018) (internal quotations and
citations omitted).

---

[12]    Although the plaintiffs have raised a Clayton Act claim, the plaintiffs forwarded no argument in
support of this claim in either their Motion for TRO or at the hearing. *See* Compl. ¶¶ 157-63; Am. Compl.
¶¶ 165-70.

[13]    *See* Defs.' Supp. Br. 1-2, ECF No. 20; Pls.' Supp. Br. 1-2, 3 n.2.

a.     *Predatory or Anticompetitive Conduct*

"Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007). However, conduct is *not* anticompetitive if it "merely harms competitors . . . while not harming the competitive process itself." *See id.* Courts may apply either a *per se* analysis or a rule of reason analysis to determine whether anticompetitive conduct has occurred. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402-403 (3d Cir. 2016). An exclusive dealing arrangement *can* potentially be a form of anticompetitive conduct, but it is not a *per se* violation of antitrust laws and must instead be analyzed under the rule of reason. *See id.* at 403; *see also Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399 (3d. Cir. 2016) (rule of reason applied to claim under *Section 1* of Sherman Act that alleged competitor hospitals and cardiology group entered into illegal exclusive dealing arrangement).[14]

The parties agree that the court should at least analyze whether JNE's Agreement with JMG reflects predatory or anticompetitive conduct. The Third Circuit has evaluated several cases involving the denial or revocation of physician privileges in hospitals, and it has reached different results after careful factual analyses without squarely overruling any of the earlier cases.[15] The parties diverge on which conduct is relevant for the assessment of "predatory or

---

[14]     The rule-of-reason burden-shifting analysis that a district court must apply at summary judgment is outlined at *Race Tires Amer. Inc. v. Hoosier Racing Tire. Corp.*, 614 F.3d 57, 74-75 (3d Cir. 2010). The burden of proof initially rests on the plaintiff, who "must show concerted action, antitrust injury, evidence that the conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets, and evidence that the objects of and the conduct pursuant to the conspiracy were illegal. The plaintiff may satisfy its burden by showing either actual anti-competitive effects or proof of the defendant's market power. The notion of 'market power' in this context is defined as the ability to raise prices above those that would exist in a competitive market." *Id.* at 74 (cleaned up).

[15]     *See, e.g.*, *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399 (3d. Cir. 2016); *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109-110 (3d Cir. 2010); *Angelico v. Lehigh*

anticompetitive conduct"—the ACS plaintiffs focus on a course of conduct stretching back to 2020 and the Jefferson defendants focus on just the imminent revocation of the ACS oncologists' current privileges at JNE campuses. "To determine whether conduct is anticompetitive, 'courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation.'" *See Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir. 2018) (quoting *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc)). Thus, the court considers the Jefferson defendants' overall course of conduct.

It is too early for the court to forecast either way whether the Jefferson defendants' actions as a whole are predatory or anticompetitive. As discussed further below, some of the defendants' actions and the defendants' overarching purpose appears to be intended to introduce *more* competition into the market of *hospitals* within the plaintiffs' proposed relevant geographic market, which is discussed further below.

That said, not all of Jefferson Health's or JNE's actions appear to be reducible to sound business decisions. One or more of the Jefferson defendants allegedly (1) constructed an infusion center that opened its doors as soon as JNE qualified for a certain discounted drug pricing program, (2) just a few hundred feet away from where ACS operated its own outpatient infusion center for about 30 years, and then (3) swiftly evicted ACS from that building as soon as the new infusion center opened its doors, even though (4) this was the height of the COVID-19 pandemic. While there is nothing wrong with the Jefferson defendants opening an outpatient infusion center near JNE's Torresdale campus, it is perhaps more than coincidence that that new infusion center opened just a few hundred feet away from ACS's infusion center. Also, it does not appear to be a sound business practice for a landlord to evict a tenant that has presumably

---

*Valley Hosp., Inc.*, 184 F.3d 268 (3d Cir. 1999); *Brader v. Allegheny General Hosp.*, 64 F.3d 869 (3d Cir. 1995); *McGary v. Williamsport Reg. Med. Ctr.*, 775 F. App'x 723 (3d Cir. 2019).

paid its bills for 30 years in the height of the COVID-19 pandemic. It's possible that a factfinder could be persuaded that this is an example of anticompetitive conduct.

It would be premature at this point for the court to evaluate every action that the ACS plaintiffs allege to be a predatory or anticompetitive business practice; the court is sufficiently persuaded that there is a "more than negligible" chance that a factfinder would deem the Jefferson defendants' pattern of behavior to be anticompetitive or predatory under the rule of reason test.

b.    *Specific Intent to Monopolize*

The plaintiffs must "point to specific, egregious conduct that evinced a predatory motivation and a specific intent to monopolize." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d. 354, 406 (3d Cir. 2016). "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell. Tel. Co. v. linkLine Commc'ns. Inc.*, 555 U.S. 438, 448 (2009). But this is not an absolute or unqualified right. *See id.* The leading Supreme Court case that outlines one exception to this rule is *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, which found that "[i]f a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory." 472 U.S. 585, 605 (1985).

Here, the plaintiffs have failed to meaningfully rebut the Jefferson defendants' arguments that their course of conduct *is* rooted in business efficiency and a desire to produce a continuity of care within and between its own hospital departments. Even at this early stage, the court very seriously doubts that ACS will ever be able to prove that Jefferson Health's or JNE's or JMG's intentions were to drive ACS out of the "Northeast Philadelphia region" market, if that market could possibly exist as ACS has drawn it.

One issue with the plaintiff's Motion for TRO's framing of the specific intent prong is that it conceptualizes "efficiency" too narrowly as "efficiency in *medical care*," emphasizing that the ACS oncologists "provide excellent quality of patient care and have contributed immensely to the defendant hospitals for decades," and that "Jefferson's actions are not in furtherance of quality care". Mot. for TRO 26 (emphasis added). The plaintiffs have not cited anything that suggests that nonprofit hospital systems are forbidden from considering economic efficiency and their own financial solvency and must only consider efficiency in the provision of health care.

There is no indication in the current court record that the Jefferson defendants are operating with anything other than an overarching goal of *business* efficiency in mind.[16] The Motion for TRO merely underscores that goal by stating that "Jefferson is ousting Plaintiff from the market to reap the benefits from" two specific federal financial programs that, according to the plaintiffs, especially benefit hospitals that offer outpatient services. *Id.* at 26; Defs' Opp'n 11.

The plaintiffs' argument that the Jefferson defendants have entered a contract with each other as a "back-door way to pay for referrals – to the detriment of Plaintiff, *Jefferson's sole competitor*" underscores another miscalculation in the framing of the Jefferson defendants' intentions. *See id.* at 26-27. It is not at all clear, even after nearly one hundred pages of filings and about four hours of oral argument, how the ACS plaintiffs could possibly position themselves as the "sole competitor" of either Jefferson Health or JNE (the only parties joined in the initial complaint), or even SKCC or JMG. Taking a large step back from the relatively small geographic region that the complaint specifies as its relevant geographic market and the two

---

[16]     The defendants assert that they came "to the thoughtful and deliberate conclusion that the Services Agreement is in 'the best interests of [Jefferson's] patients and further[s] its mission." Defs.' Opp'n 10. The plaintiffs highly contest that this is the right decision for many patients and seem to argue that this simply is not what a nonprofit hospital system would do. Thus, the court considers the Jefferson defendants' argued business rationales, which are not necessarily in evidence, but which the plaintiffs' own filings actually support.

parties that the complaint positions as the sole competitors in that market, the bigger picture is that Jefferson Health also seeks to compete with at least one of the several other large hospital systems in Philadelphia—Temple University's health system. Temple University's health system has acquired all or part of Fox Chase Cancer Center (FCCC). *See* Tr. 101-02. Jefferson Health apparently seeks to compete with *that* pairing. *See id.* (analogizing the relationship of SKCC and Jefferson Health to that of FCCC and Temple).

It is obvious that Jefferson Health or JNE seemed to be interested in acquiring an oncology team at some point between its purchase of Aria in 2016 and early 2020.[17] ACS did not want to be absorbed into the Jefferson Health system—as is its right—and it instead chose the uncertain path of coordinating its own outpatient and inpatient services alongside the care provide by JNE and its staff. Eventually, Jefferson Health found an oncology team that it *could* acquire—SKCC. It's unclear why ACS believes the court should assume that Jefferson Health or JNE closed its oncology staff to SKCC solely to crush ACS as competition. It is also unclear why ACS believes that after purchasing Aria, JNE forever would be forced to keep its doors, hospital beds, and staff support open to satisfy ACS's inpatient needs.

c.   *Dangerous Probability of Achieving Market Power*

Typically, the issue of whether a defendant poses a dangerous probability of achieving market power is "a particularly fact-intensive inquiry" that a district court should not resolve at the pleading stage, "unless it is clear on the face of the complaint that the 'dangerous probability' standard cannot be met as a matter of law." *See Broadcom Corp.*, 501 F.3d at 318 (internal quotations and citations omitted). The court may consider "factors such as significant market

---

[17]   It is not clear whether Jefferson Health ever formally offered to purchase ACS, but the complaint argues that one of the purposes for the Jefferson defendants' course of conduct was to punish Dr. Terzian "in retaliation for [ACS's] refusal to be employed by Jefferson". Compl. ¶ 63.

share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand," and "[n]o single factor is dispositive." *See id*.

> The plaintiffs propose a relevant product market as
>
> the market for oncology (or cancer care) for commercially or governmentally insured patients. . . . The market includes non-surgical management and treatment of cancer by physicians in an inpatient and outpatient settings, including chemotherapy, hormone therapy, immunotherapy, and other targeted therapy for the treatment of cancer. Doctors providing these services are hematologists/ oncologists, who are specialized physicians who receive an extended education that includes medical school, a three-year residency in general internal medicine and an additional two-year fellowship in medical oncology.

Compl. ¶ 128. The defendants have not contested this proposed relevant product market for purposes of this motion.

The initial complaint[18] proposed a relevant geographic market of "the Northeast Philadelphia region, specifically consisting of Bucks and Philadelphia counties," and then listed a series of zip codes that covers only portions of Philadelphia and Bucks County: "19007, 19020, 19030, 19047, 19053, 19054, 19055, 19056, 19057, 19111, 19114, 19116, 19124, 19135, 19136, 19149, and 19152." Compl. ¶¶ 123, 123 n.4. The defendants heavily contest the plaintiffs' proposed relevant geographic market, and persuasively argue that it could be characterized as gerrymandering or cherry picking. *See* Defs.' Opp'n 13. Bucks County is one of several counties bordering Philadelphia, and it is unclear why a portion of Bucks County is included and no other county. The plaintiffs also allege that Route 1 presents a dividing line for their patients, cursorily alleging that "many patients do not want to travel west of Route 1." *See* Compl. ¶¶ 123, 125-26.

---

[18]     An additional reason that the court does not base its decision to deny the instant motion on the amended complaint is that it conspicuously omits any reference whatsoever to the zip codes that originally defined the plaintiffs' so-called "Northeast Philadelphia region, specifically consisting of portions of Bucks and Philadelphia counties." *See* Am. Compl. ¶¶ 129-38.

If that is true, then it is not clear why, as the defendants note, *six* of the zip codes in the proposed geographic market are west of Route 1. *See* Defs.' Opp'n 13.

Assuming arguendo that an expert *could* credibly testify that this collection of zip codes is the relevant geographic market for oncology treatment, the defendants have pointed out that at least two other hospitals that provide inpatient oncology services are in the proposed market in the initial complaint: FCCC's main campus and Nazareth Hospital. *See id.*; Tr. 69, 72. But the plaintiffs assert that the plaintiffs and the defendants are the only two competitors in this proposed market. FCCC, as mentioned above, is part of the Temple University health system and has a closed oncology staff—it is unclear how the plaintiffs could include FCCC's zip code but exclude them from the competition. And the complaint mentions Nazareth Hospital only to state that it "has only an extremely small proportion of cancer care from the area and has a generally poor reputation for cancer care." Compl. ¶ 125. The complaint neglects to mention that four of the five ACS oncologists appear to be affiliated with Nazareth Hospital.[19]

Although the court probably would be willing to accept an allegation at this early stage that Nazareth "has only an extremely small proportion of cancer care from the area," the court is not willing to accept that the plaintiffs have not alleged *anything* about the "proportion of cancer care" that other oncologists in the area provide—specifically ACS, FCCC, and any Jefferson Health hospitals located in the proposed relevant geographic market. Overall, the court has no picture of the overall market for oncology care—the court only has factoids about ACS's oncology care, and even those allegations are not very clear. For instance, the complaint estimates that at any given time, about 10 to 15 of ACS's patients are admitted at JNE. *See id.* at

---

[19]    To support this claim, the defendants present an affidavit from Dr. Angela Nicholas that refers to each ACS oncologist's self-identified hospital affiliations in his or her JNE medical staff application. *See* Defs.' Opp'n, Ex. A, ¶¶ 7-12.

¶ 104. But during oral argument, it became clear that the estimate of 10 to 15 patients was comprised of patients admitted for any reason—not just for inpatient oncology or hematology services. N.T. 67-68, 139-40.[20]

Finally, it's simply not true that if the Agreement between JNE and JMG is executed, the ACS plaintiffs will be unable to perform inpatient *or* outpatient oncology services in this proposed geographic market. Nothing prevents the ACS plaintiffs from offering outpatient services. And nothing prevents the ACS plaintiffs from performing scheduled inpatient services – ACS just can't perform those services at JNE. ACS does not seem interested in operating at Nazareth, but four of five of its oncologists appear to be affiliated with Nazareth, and it is not clear why ACS cannot transport their patients to conduct *planned* inpatient services there or somewhere else.[21] At this point, the only services that it is clear that the ACS plaintiffs will no longer be able to perform are inpatient oncology and hematology services at JNE campuses. The plaintiffs have provided insufficient data for the court to estimate how many of their patients are hospitalized for emergencies that only an oncologist or hematologist could treat.[22] Finally, given

---

[20]    The complaint also provides another estimate that was not further explained: "Between 5 and 10 patients per week depend on outpatient transfusions which have to be received in a hospital setting. If Plaintiff's physicians are not allowed to place orders for transfusion, they will be forced to send some of the patients to the ER where they will wait for hours and may stay overnight for an outpatient procedure." Compl. ¶ 137m. It is unclear if this refers just to the plaintiffs' patients, and as stated elsewhere, it is not clear why ACS is unable to transport patients to other inpatient facilities (like Nazareth) where ACS physicians themselves can administer the treatment. This figure of 5 to 10 transfusions was not mentioned at the hearing.

[21]    While ACS alleges that its patients generally cannot or do not want to transport themselves further, it is unclear why ACS would be incapable of arranging that transportation, at least for the pendency of this lawsuit.

[22]    Stating that 95% of ACS's patients would be transported to JNE in an emergency and that 10 to 15 of ACS's patients are admitted inpatient at any given time *for any reason* does not give the court any notion of how many ACS patients are normally at JNE specifically for inpatient oncology or hematology treatments like chemotherapy or blood transfusions, or how many of those patients absolutely could not be transported to Nazareth or somewhere else where ACS oncologists can personally administer inpatient services.

the uncertainties of what the plaintiffs may or may not be able to do within the boundaries of their potential internal medicine privileges at JNE, the court is not persuaded at this point that the ACS oncologists will be unable to provide many inpatient services that their patients may need but that are not traditionally classified as oncology or hematology services. While this may prevent the plaintiffs from administering some emergency inpatient treatments to their patients that they are otherwise qualified to provide, it is not clear from the record how often ACS's patients *need* emergency inpatient oncology or hematology treatments or what portion of the overall proposed oncology market are these treatments.

For all of these reasons, even if the court assumes at this stage that the plaintiffs have a reasonable likelihood of success in proving the "anticompetitive conduct" element of their attempted monopolization claim, the court is not persuaded at this point that there is a "more than negligible" chance that the plaintiffs can make out the "specific intent" or "dangerous probability" elements of their Section 2 claim.

2.    Unreasonable Restraint on Trade, Sherman Act § 1

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1. A plaintiff proves a violation of Section 1 by proving: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005).

"Section 1 applies only to concerted action and does not proscribe independent action by a single entity, regardless of its purpose and effect on competition." *Deutscher Tennis Bund v.*

*ATP Tour, Inc.*, 610 F.3d 820, 834 (3d Cir. 2010). Sometimes "distinct legal entities are incapable of concerted action for the purposes of § 1 and must be viewed as a single entity." *Id.* Generally, "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984). However, the *Copperweld* Court did not spell out every situation in which distinct legal entities must be considered single economic entities; it instead encouraged lower courts to assess the substance over the form of the economic arrangement. *See Deutscher Tennis Bund*, 610 F.3d at 834. *Copperweld* emphasized that "[a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Copperweld*, 467 U.S. at 771.

The Third Circuit has held that a parent corporation and two of its wholly owned subsidiaries operated as a single corporate entity, even when the parent and one of the subsidiaries were in the process of becoming separate entities. *See Eichorn v. AT & T Corp.*, 248 F.3d 131, 138-39 (3d Cir. 2001). Further, the Third Circuit has held that joint ventures of separately owned entities could operate as single entities for purposes of Section 1. *See Deutscher Tennis Bund*, 610 F.3d at 834. But the Third Circuit has also noted that there are exceptions to the general rule: "For example, where a single entity is made up of independent, competing economic entities—as is true at a hospital with medical professionals who are in competition with one another—those individuals constitute independent actors" who can conspire with one another to violate Section 1. *McGary v. Williamsport Regional Med. Ctr.*, 775 F. App'x 723, 728 (3d Cir. 2019). Another exception exists for "employees [who] act for their own interests, and outside the interests of the corporation." *See id.* Thus, the question appears to

be "whether any combination of the Defendants in this case is capable of concerted action." *See id.*

Here, ACS's Motion for TRO does not address what seems to be an obvious single-entity issue. *See* Motion for TRO 27-28. JNE has listed several other circuits that have held that sibling subsidiaries are single entities. *See* Resp. 15. ACS provided additional argument in its supplemental briefing, asserting that JMG is a "not-for-profit medical practice that is not owned by Jefferson; therefore, by definition, it is not a subsidiary, and Jefferson is not its parent." Pl.'s Supp. Memo. 4.

At most, ACS has persuaded the court that it does not automatically follow from *Copperweld* that JMG and Jefferson Health, JNE and Jefferson Health, or JMG and JNE are single entities that cannot compete with each other for purposes of Section 1. The court considers *McGary* to be helpful guidance here. The court has not heard anything that suggests that by participating in the Agreement, either JMG, JNE, or Jefferson Health is acting either (1) in competition with another member of JMG, JNE or Jefferson Health or (2) acting for that member's own interests *and against* the interests of that member's corporation. It appears that JMG, JNE, and Jefferson Health—regardless of whether they are considered subsidiary, subsidiary, and parent or joint ventures of separately owned entities or something else—are working to an end that forwards each (not-for-profit) business's economic interests. It does not appear that any one of these entities has coerced any other entity into this agreement or that any entity is forced to operate contrary to its own interests. Instead, this appears to be a mutually beneficial economic arrangement for the parties that have joined the agreement. Therefore, the plaintiffs have not cleared the basic hurdle of Section 1 of the Sherman Act by demonstrating that two distinct entities have conspired.

The court briefly addresses other elements of the prima facie case that the ACS plaintiffs would eventually need to prove: For the same reasons discussed at Part III.A.1.c, *infra*, ACS currently cannot show that there are anti-competitive effects within the proposed relevant geographic market that ACS has so confusingly crafted.  However, it is likely that ACS could meet two other elements of its Section 1 claim: ACS can show that the defendants are intentionally working together in some capacity—the Agreement between JNE and JMG is in ink. Additionally, ACS probably can show, at a prima facie level, that it will be proximately harmed by the Agreement.

### B.        ACS Has Not Shown a Risk of Irreparable Harm

"[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 262 (3d Cir. 2020) (internal quotations and citation omitted). The plaintiffs cite Third Circuit cases that emphasize that loss of control of reputation, goodwill, trade, and market share could be types of irreparable harm. *See* Mot. for TRO 37 (citing *Pappan Enter., Inc. v. Hardee's Food Sys.*, 143 F.3d 800, 805 (3d Cir. 1998) and *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 595 (3d Cir. 2000)).

Here, it is not clear that the plaintiffs face *irreparable* harm by the loss of the ACS oncologists' privileges at JNE. The ACS oncologists have applied for internal medicine staff privileges at JNE, and it seems likely that those privileges will be granted. However, the plaintiffs' amended complaint asserts that "the option to apply for internal medicine privileges is not a viable substitute because the exclusive contract forbids Plaintiffs from seeing their patients because they have cancer." Am. Compl., ¶ 143 n.4. The only evidence before the court that could

possibly support that claim is President Sweeney's letter. The letter repeatedly uses the phrase "cancer-related care" without clearly defining it. *See* p. 8, *infra.* The court cannot predict what JNE will consider to be "cancer related" care. For instance, suppose that an ACS patient undergoes outpatient chemotherapy and experiences side effects that prompt her ACS oncologist to consult with a cardiologist at JNE. If the patient is then admitted to JNE for further attention from that cardiologist, but the ACS oncologist has no intention of administering any treatments that are understood to be uniquely offered by an oncologist or hematologist, then is that "cancer related" care? Or is it care that an internal medicine specialist could provide even without some special training in oncology and hematology, and therefore within an ACS oncologist's internal medicine privileges? Will JNE consider the arguable difference between those two things, or, as the amended complaint forecasts, will JNE label anyone with any side effect that might be related to a course of cancer treatment be off limits to an ACS oncologist with internal medicine privileges?

The problem is that this is all currently theoretical; ACS oncologists do not yet have internal medicine privileges and there is no evidence before the court besides President Sweeney's letter. Instead, the court looks at the narrower category of inpatient services that the Agreement between JNE and JMG clearly prevents the plaintiffs from providing at JNE – inpatient oncology and hematology services. And the court determines that it is not clear that the ACS oncologists or ACS will suffer irreparable harm if they cannot perform inpatient oncology and hematology services at JNE while this litigation is pending. If only 10 to 15 of ACS's patients are hospitalized at JNE at any given time, and if ACS can at least visit those patients and obtain their medical records, then it is unclear how that will irreparably harm either ACS's practice or the ACS oncologists' reputations or anything else that cannot be financially remedied.

One issue with the plaintiffs' arguments here is that they *can* give their patients the option of receiving inpatient treatment directly from them at a hospital farther away than JNE, and if their patients cannot easily get to that hospital, ACS can coordinate the transport and bill Jefferson at the end of this litigation if ACS ultimately prevails in this lawsuit. For an average of 10 to 15 patients, only some of which would be receiving actual oncology or hematology services, that does not appear to be logistically impossible. Or, frankly, the patients can choose to receive inpatient oncology and hematology care at JNE—there is no evidence in the record that SKCC is anything short of well qualified to provide these services, and there is no reason why ACS cannot track how many patients choose to go to JNE and then calculate the costs at the end of the litigation.

For all of these reasons, the ACS plaintiffs have failed to show that it is more likely than not that they will suffer irreparable harm if they cannot provide inpatient oncology or hematology services to their patients at JNE for the duration of this lawsuit.

### C.      Other TRO Elements Cannot Factor Into this Decision, But Weigh in ACS's and the ACS Oncologists' Favor

The test for a TRO or preliminary injunction is very clear that the court cannot reach the third and fourth prongs if either of the two threshold prongs are not met. However, the court briefly notes that, based on the current record, had it reached the third and fourth prongs, it would have found that both prongs weigh in favor of granting the TRO.

In considering the third prong, it appears that the ACS plaintiffs stand more to lose from the Agreement than Jefferson Health, JNE, JMG, or SKCC, or all of those entities combined stand to lose if the ACS oncologists' oncology and hematology privileges are not abruptly

terminated.[23] The court was persuaded by testimony from three of the ACS oncologists that this will likely disrupt ACS's daily operations. ACS's current patient base are also interested parties in this lawsuit, and they are presented with choices that they would not have had to make had the Agreement not happened. For instance, the patients who live in the neighborhood of JNE-Torresdale who need to go to a hospital for chemotherapy or other cancer treatment would be faced with the choice of either remaining with their ACS oncologist and going to a hospital farther away than the hospital in their actual neighborhood or seeing a different oncologist at JNE-Torresdale.

Finally, as it relates to the fourth prong, the record supports a finding that the public interest is better served by keeping ACS in business and allowing their physicians to continue to serve the community that they have been serving for decades. ACS's allegations are plausible that ACS is currently more enmeshed with the community immediately surrounding JNE's hospitals (at least the Torresdale campus), and that its oncologists are qualified to offer both inpatient and outpatient services. Perhaps someday JNE and SKCC will be equipped to provide the kinds of wraparound, long-term outpatient and inpatient care that ACS currently provides its clients. But it does not seem to necessarily serve the community to quickly sever the artery between the services that ACS provides and the services that JNE provides, and then hope that JNE and SKCC can coordinate together to fill that gap. The court notes that the Jefferson defendants have briefly argued that Jefferson will be better able to ensure that its own patients receive fully integrated and coordinated care—but before SKCC was acquired, it is unclear how the cooperation of ACS and JNE's hospitalists really caused any problems for the coordinated care of patients admitted at JNE. Defs.' Opp'n 24-25. Thus, this factor currently weighs in the

---

[23]     This is predicted to be true for at least the duration of this lawsuit. The court cannot possibly assess at this early point what the permanent financial losses might be to any one party.

ACS plaintiffs' favor.

## IV.    CONCLUSION

The court understands that this litigation is bigger than just the latest Agreement that effectively curtailing the oncology and hematology services that ACS was able to provide at JNE campuses. These issues have been brewing for years. But the *immediate* concern of irreparable harm is not yet clear. And the ACS plaintiffs' concerns about the future of their practice cannot breathe life into these currently lifeless antitrust claims. For all of these reasons, the plaintiffs' motion for a TRO and preliminary injunction is denied without prejudice.


**BY THE COURT:**


/s/ Kai N. Scott
**HON. KAI N. SCOTT**
**United States District Court Judge**